The opinion of the court was delivered by
Stegall, J.:
Henry Petersen-Beard challenges his sentence to lifetime postrelease registration as a sex offender pursuant to the Kansas Offender Registration Act (KORA), K.S.A. 22-4901 et seq., as cruel and unusual punishment in violation of § 9 of the Kansas Bill of Rights and the Eighth Amendment to the United States Constitution. Because we find that lifetime registration as a sex offender pursuant to KORA is not punishment for either Eighth *193 Amendment or § 9 purposes, we reject Petersen-Beard’s argument that it is unconstitutionally cruel and/or unusual and affirm his sentence. In so doing, we overrule the contrary holdings of State v. Redmond, 304 Kan. 283, 371 P.3d 900 (2016), State v. Buser, 304 Kan. 181, 371 P.3d 886 (2016), and Doe v. Thompson, 304 Kan. 291, 373 P.3d 750 (2016).
Factual and Procedural Background
Petersen-Beard pled guilty to and was convicted of one count of rape for having sexual intercourse with a 13-year-old girl when he was 19 years old. Prior to sentencing, he filed motions asking the district court to depart from the presumptive guidelines sentence and to declare KORAs requirement of lifetime registration unconstitutional under § 9 of the Kansas Bill of Rights and the Eighth Amendment to the United States Constitution. The district court granted Petersen-Beard’s motion for a downward durational departure but denied his request to find KORAs lifetime registration requirements unconstitutional. As such, the district court sentenced Petersen-Beard to 78 months’ imprisonment with lifetime postrelease supervision and lifetime registration as a sex offender — the lowest sentence permitted by law.
Petersen-Beard appealed the district court’s ruling to the Court of Appeals but did not prevail. State v. Petersen-Beard, No. 108,061, 2013 WL 4046444 (Kan. App. 2013) (unpublished opinion). Petersen-Beard now brings his appeal to this court reprising the arguments he made below that the requirement in Kansas law of lifetime registration as a sex offender is unconstitutional. We granted Petersen-Beard’s petition for review pursuant to K.S.A. 20-3018(b), exercise jurisdiction pursuant to K.S.A. 60-2101(b), and affirm.
Analysis

Standard of Review

This appeal requires us to decide whether KORAs mandatoiy lifetime sex offender registration as set forth in K.S.A. 22-4901 et seq., runs afoul of either the Eighth Amendment’s prohibition *194 against “cruel and unusual punishments” or § 9’s prohibition against “cruel or unusual punishment.” The constitutionality of a statute is a question of law over which this court exercises plenary review. State v. Mossman, 294 Kan. 901, 906, 281 P.3d 153 (2012). “We presume statutes are constitutional and must resolve all doubts in favor of a statutes validity.” State v. Soto, 299 Kan. 102, 121, 322 P.3d 334 (2014). “It is not the duty of this court to criticize the legislature or to substitute its view on economic or social policy; it is the duty of this court to safeguard the constitution.” State ex rel. Six v. Kansas Lottery, 286 Kan. 557, 562, 186 P.3d 183 (2008).
Typically, challenges arising under either the Eighth Amendment or § 9, or both, attack criminal sanctions against persons convicted of crimes as being cruel and/or unusual. Such is the case with Petersen-Beards argument here. However, as the State points out, there remains a threshold question as to whether the challenged sanction is punishment at all for purposes of eidrer the Eighth Amendment or § 9, or is rather a civil and nonpunitive sanction. Here, the State claims that KORAs requirement of lifetime sex offender registration in Petersen-Beard’s case is not punishment at all and is therefore not subject to our normal cruel and unusual analysis. For the reasons set forth below, we agree.

KOBA’s lifetime sex offender registration requirements are not punishment for purposes of applying the United States Constitution.

In Smith v. Doe, 538 U.S. 84, 92, 123 S. Ct. 1140, 155 L. Ed. 2d 164 (2003), the United States Supreme Court set out the following framework for analyzing whether a legislature s statutory scheme is punitive:
“We must ‘ascertain whether the legislature meant the statute to establish “civil” proceedings.’ Kansas v. Hendricks, 521 U.S. 346, 361 (1997). If the intention of the legislature was to impose punishment, that ends the inquiry If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, we must further examine whether the statutory scheme is ‘ “so punitive either in purpose or effect as to negate [the State’s] intention” to deem it “civil.”’ Ibid. (quoting United States v. Ward, 448 U.S. 242, 248-249 (1980)). Because we ‘ordinarily defer to the legislature’s stated intent,’ Hendricks, supra, at 361, ‘“only the clearest proof’ will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty’ Hudson v. United States, 522 U.S. 93, 100 *195 (1997) (quoting Ward, supra, at 249, [100 S. Ct. at 2641]); see also Hendricks, supra, at 361; United States v. Ursery, 518 U.S. 267, 290 (1996); United States v. One Assortment of 89 Firearms, 465 U.S. 354, 365 (1984).”
This framework is often referred to as the “intent-effects” test. Moore v. Avoyelles Correctional Center, 253 F.3d 870, 872 (5th Cir. 2001). In Smith v. Doe, the Supreme Court reasoned that a “conclusion that the legislature intended to punish” would resolve the question of the punitive nature of the statutory scheme “without further inquiry into its effects.” 538 U.S. at 92-93. Applying the intent-effects test to KORA’s lifetime registration provisions, we have held today in Thompson that our legislature intended those provisions of KORA to be a nonpunitive and civil regulatory scheme rather than punishment. See Doe v. Thompson, 304 Kan. at 309-17, (citing State v. Myers, 260 Kan. 669, 923 P.3d 1024 [1996] [lifetime postrelease registration under Kansas Sex Offender Registration Act was nonpunitive in nature], cert. denied 521 U.S. 1118 [1997]). We agree and do not disturb that aspect of Thompson or its companion cases. See State v. Redmond, 304 Kan. at 287; State v. Buser, 304 Kan. at 185.
Because the legislature did not intend for KORA’s lifetime sex offender registration scheme to be punishment, we must next turn to the effect of those provisions to determine whether, by “ ‘ “the clearest proof,””’ those effects “‘override legislative intent and transform what has been denominated a civil remedy into a criminal penalty.’” Smith, 538 U.S. at 92. The Supreme Court in Smith utilized the seven factors identified in Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69, 83 S. Ct. 554, 9 L. Ed. 2d 644 (1963), to decide whether the effects of the legislative enactment negated and overrode the legislature s intent to establish a civil regulatory scheme. Smith, 538 U.S. at 97. The Mendoza-Martinez factors are:
“Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment — retribution and deterrence, whether die behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally he connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned ....” Mendoza-Martinez, 372 U.S. at 168-69.
*196 While in Smith, the Mendoza-Martinez factors were applied to determine whether a lifetime registration scheme was punishment for ex post facto purposes rather than for purposes of the Eighth Amendment, there exists no analytical distinction between or among the different constitutional contexts in which the question of punishment versus a civil regulatory scheme can arise. “The common inquiry across the Court’s Eighth Amendment, ex post facto, and double jeopardy jurisprudence is determining whether the government’s sanction is punitive in nature and intended to serve as punishment.” Hinds v. Lynch, 790 F.3d 259, 264 n.5 (1st Cir. 2015) (citing Mendoza-Martinez); see also United States v. Under Seal, 709 F.3d 257, 263-64 (4th Cir. 2013) (using Mendoza-Martinez factors to determine federal Sex Offender Registration and Notification Act (SORNA), 42 U.S.C. § 16901 et seq. (2012), is nonpunitive for purposes of the Eighth Amendment); Myrie v. Commissioner, N.J. Dept. of Corrections, 267 F.3d 251, 262 (3d Cir. 2001) (applying Mendoza-Martinez factors to an Eighth Amendment “Excessive Fines” Clause challenge); Cutshall v. Sundquist, 193 F.3d 466, 477 (6th Cir. 1999) (using Mendoza-Martinez factors to determine Tennessee’s Sex Offender Registration and Monitoring Act was nonpunitive under the Eighth Amendment); Hare v. City of Corinth, MS, 74 F.3d 633, 651-52 (5th Cir. 1996) (Dennis, J., concurring) (using Mendoza-Martinez factors to evaluate whether a pretrial detainee was punished under the Eighth Amendment); People v. Adams, 144 Ill. 2d 381, 388, 581 N.E.2d 637 (1991) (court would have used Mendoza-Martinez factors to evaluate Eighth Amendment claim if conclusive evidence of legislative intent was unavailable); In re Justin B., 405 S.C. 391, 404, 747 S.E.2d 774 (2013) (using Mendoza-Martinez to evaluate sex offender registration under the Eighth Amendment).
Given this, if KORA’s fifetime sex offender registration requirement is punishment for either ex post facto or double jeopardy purposes, it must necessarily also be punishment for Eighth Amendment purposes. The reverse would likewise be true. Thus, while the question of whether KORA is punishment arises here in the context of tire Eighth Amendment, we must necessarily address *197 our decisions, issued today, in Redmond, Buser, and Thompson. In Redmond, Buser, and Thompson, we held that the identical statu-toiy provisions we consider here are, in fact, punishment for ex post facto purposes. Redmond, 304 Kan. at 289-90; Buser, 304 Kan. at 189-90; Thompson, 304 Kan. at 328.
If we were to follow those holdings, we would conclude that KORAs lifetime sex offender registration requirement is punishment for Eighth Amendment purposes and we would proceed with a cruel and unusual analysis pursuant to established precedent. However, this court is persuaded that the holding of Thompson, Buser, and Redmond that KORA constitutes punishment is incorrect. We are instead convinced by the dissent in Thompson that a faithful application of federal precedents requires us to find that the provisions of KORA at issue here are not punitive for purposes of applying our federal Constitution. We therefore overrule the contrary holdings of Thompson, Buser, and Redmond.
Because we are persuaded by the Thompson dissent on this question, we take the unusual step of quoting liberally from that opinion and adopting its reasoning in toto:
“Federal appellate courts have unanimously held retroactive application of the federal offender registration requirements found in SORNA does not violate the Ex Post Facto Clause. United States v. Brunner, 726 F.3d 299, 303 (2d Cir. 2013); United States v. Parks, 698 F.3d 1, 5-6 (1st Cir. 2012); United States v. Felts, 674 F.3d 599, 606 (6th Cir. 2012); United States v. Elkins, 683 F.3d 1039, 1045 (9th Cir. 2012); United States v. Leach, 639 F.3d 769, 773 (7th Cir. 2011); United States v. W.B.H., 664 F.3d 848, 860 (11th Cir. 2011); United States v. Shenandoah, 595 F.3d 151 (3d Cir.), cert. denied 560 U.S. 974 (2010), abrogated on other grounds by Reynolds v. United States, 565 U.S. 432, 132 S. Ct. 975, 181 L. Ed. 2d 935 (2012); United States v. Gould, 568 F.3d 459, 466 (4th Cir. 2009), cert. denied 559 U.S. 974 (2010); Young, 585 F.3d at 206 (noting that Young made no “effort to prove that the effect of SORNA is so punitive as to make it not a civil scheme, and any attempt to do so would have been futile”); United States v. May, 535 F.3d 912, 919-20 (8th Cir. 2008), cert. denied 556 U.S. 1258 (2009), abrogated on other grounds by Reynolds, 132 S. Ct. 975 (2012); United States v. Hinkley, 550 F.3d 926, 937-38 (10th Cir. 2008), abrogated on other grounds by Reynolds v. United States, 565 U.S. 432, 132 S. Ct. 975, 181 L. Ed. 2d 935 (2012); see also United States v. Under Seal, 709 F.3d 257, 265 (4th Cir. 2013) (applying Mendoza-Martinez factors to hold SORNA was not cruel and unusual punishment as applied to a juvenile); United States v. Stacey, 570 Fed. Appx. 213, 216 (3d Cir. 2014) (holding ex post facto challenge to conviction for failing to register under SORNA *198 foreclosed by Shenandoah); United States v. Sampsell, 541 Fed. Appx. 258, 260 (4th Cir. 2013) (holding ex post facto challenge to SORNA foreclosed by Gould).
“In addition, federal circuit courts have upheld state sex offender registration laws against federal ex post facto challenges, even when those state laws contained provisions more expansive in scope and impact than either SORNA or the Alaska provisions addressed in Smith. See Litmon v. Harris, 768 F.3d 1237, 1242-43 (9th Cir. 2014) (upholding California requirement that offenders register in-person every 90 days); American Civil Liberties Union of Nevada v. Masto, 670 F.3d 1046, 1051, 1058 (9th Cir. 2012) (upholding Nevada law expanding category of individuals who must register, increasing time period offenders were subject to registration, adding in-person registration requirements, and expanding law enforcement obligations to notify specified entities that an offender resided nearby); Doe v. Bredesen, 507 F.3d 998, 1000 (6th Cir. 2007) (upholding Tennessee law requiring, among other things, extended lifetime registration and satellite-based monitoring with wearable GPS device); Hatton v. Bonner, 356 F.3d 955, 967 (9th Cir. 2004) (upholding California law containing several provisions different from the Alaska statute analyzed in Smith).
“The majority disingenuously characterizes this unanimous body of caselaw as just the decisions of‘a number of Federal Circuit Courts of Appeal,’ which it then discounts by noting the obvious, i.e., there are differences between the federal SORNA and our state’s KORA. 304 Kan. at 327-28. And while it is true that none of the statutory schemes upheld by other courts are identical to KORA, there is substantial overlap, and so the rationale from those decisions should apply with equal force here. I would not so quickly disdain this federal caselaw because it compellingly answers the real question presented: Are there convincing reasons to believe the United States Supreme Court would view KORA differently than it viewed die Alaska law in 2003 when it decided Smith? See Litmon, 768 F.3d at 1243 (‘[Tjhere is no reason to believe that the addition of [die 90-day, in-person registration] requirement would have changed the outcome [in Smith].’). If the answer to diat question is no, dien this court must affirm.
“[Given diat'tiie legislature did not intend KORA to be punishment], we must decide whether KORA is ‘ “so punitive either in purpose or effect as to negate [the State’s] intention” to deem [KORA] “civil.”’” Smith, 538 U.S. at 92. This is where I depart from the majority’s analysis.
“For this second step, we should follow the federal factors laid out in Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69, 83 S. Ct. 554, 9 L. Ed. 2d 644 (1963). See Smith, 538 U.S. at 97. Those factors consider die degree to which the regulatory scheme imposes a sanction that: (1) has historically been regarded as punishment; (2) constitutes an affirmative disability or restraint; (3) promotes die traditional aims of punishment; (4) is rationally connected to a nonpunitive purpose; (5) is excessive in relation to die identified nonpunitive purpose; (6) contains a sanction requiring a finding of scienter; and (7) applies the sanction to behavior that is already a,crime. Mendoza-Martinez, 372 U.S. at 168. In Smith, the Court focused on the first five as more relevant in evaluating Alaska’s registration and *199 notification law, concluding the remaining two were of ‘little weight.’ 538 U.S. at 105. I will do the same.
“Historical Form of Punishment
“The majority holds that the 2011 KORA crosses the line drawn by Smith’ by too closely resembling the shaming punishments from the colonial period. 304 Kan. at 321. KORA does this, according to the majority, by posting the registrant’s information on the Internet, ‘branding’ a registrant’s driver’s license with the letters ‘RO,’ and requiring quarterly registration in each location where an offender works, lives, or attends school. Let’s take each of these in turn.

“Posting offender information on the Interriet

“As summarized below, there is overwhelming federal authority holding that Internet posting of registrant information is not analogous to historical forms of punishment. The analysis used to reach that conclusion applies in equal force to KORA, regardless of other differences the statutory schemes may have. The majority overreaches by rejecting this caselaw and adopting a contrary view.
“In Smith, the United States Supreme Court held that Alaska’s offender registration act could apply retroactively and ‘[t]he fact that Alaska posts the information on the Internet does not alter our conclusion.’ 538 U.S. at 99. The Court held the posting requirement was not akin to historical punishments despite recognizing that it subjects the offender to public shame or humiliation because most of the information related to an already public criminal record and dissemination of it furthers a legitimate governmental objective. 538 U.S. at 99. The Smith Court explained:
‘[T]he stigma of Alaska’s Megan’s Law results not from public display for ridicule and shaming but from the dissemination of accurate information about a criminal record, most of winch is already public. Our system does not treat dissemination of truthful information in furtherance of a legitimate governmental objective as punishment. On the contraiy, our criminal law tradition insists on public indictment, public trial, and public imposition of sentence. Transparency is essential to maintaining public respect for the criminal justice system, ensuring its integrity, and protecting the rights of the accused. The publicity may cause adverse consequences for the convicted defendant, running from mild personal embarrassment to social ostracism. In contrast to the colonial shaming punishments, however, the State does not malee the publicity and the resulting stigma an integral part of the objective of the regulatory scheme.’ 538 U.S. at 98-99.
“The Smith Court then added:
‘The fact that Alaska posts the information on the Internet does not alter our conclusion. It must be acknowledged that notice of a criminal conviction subjects the offender to public shame, the humiliation increasing in proportion to die extent of the publicity. And the geographic reach of the *200 Internet is greater than anything which could have been designed in colonial times. These facts do not render Internet notification punitive. The purpose and the principal effect of notification are to inform die public for its own safety, not to humiliate the offender. Widespread public access is necessary for the efficacy of the scheme, and the attendant humiliation is but a collateral consequence of a valid regulation.’ 538 U.S. at 99.
In so holding, the Court’s analysis recognizes the obvious — posting information on the Internet makes it far more accessible and subjects the offender to increased shame and humiliation. Nevertheless, the Court held that Internet posting did not make Alaska’s statutory scheme punitive.
“The majority characterizes the Smith Court’s 2003 analysis of the Internet as ‘antiquated,’ and then concludes: ‘Any suggestion that disseminating sex offender registration [information] on an Internet website reaches no more members of the public and is no more burdensome to the offender than maintaining an archived criminal record simply ignores the reality of today’s world.’ 304 Kan. at 322.
“But as seen from its holding, Smith did not base its conclusion on some old-fashioned, dial-up modem/floppy disk notion of the World Wide Web; nor did it consider accessing offender information on the Internet nothing more than a walk to the courthouse to thumb through publicly available paper files. Smith’s rationale withstands the more recent development of a mobile, smartphone Internet. Indeed, these developments can be viewed as furthering the nonpunitive, public safety ends supporting offender registration because, as Smith acknowledged, ‘[widespread public access is necessary for the efficacy of the scheme.’ Smith, 538 U.S. at 99. The majority simply disagrees with the Court’s conclusion but needs a rationale for considering the question further. This becomes overwhelmingly evident when the authority from more recent courts applying Smith is acknowledged.
“Consider first the federal notification statute, SORNA. Similar to KORA, tire federal law requires that offender information including the offenders’ names, physical descriptions, photographs, criminal offenses, and criminal histories be made publicly available on the Internet. See 42 U.S.C. §§ 16914, 16918-16920 (2012). Under SORNA, the states and enumerated territories, including the District of Columbia and Puerto Rico, must each maintain websites for tins purpose. See 42 U.S.C. §§ 16911(10); 16918(a) (2012). The federal government, in turn, must maintain a website containing ‘relevant information for each sex offender and other person fisted on a jurisdiction’s Internet site.’ 42 U.S.C. § 16920. Each of these websites must malee the information obtainable ‘by a single query for any given zip code or geographic radius set by the user.’ 42 U.S.C. §§ 16918(a), 16920(b). And among SORNA’s others mandates, an appropriate official must affirmatively distribute notice of an individual’s sex offender status to ‘each school and public housing agency’ in the area where that sex offender resides. 42 U.S.C. § 16921(b)(2) (2012). In short, SORNA goes further than the Alaska scheme at issue in Smith and further than KORA as to affirmative notification of statutorily specified groups.
*201 “Nevertheless, all federal circuits addressing whether SORNA’s publication requirements are punitive have followed Smith and held they are not, despite candidly recognizing they can result in greatly increased public shame. See, e.g., Parks, 698 F.3d at 5-6 (noting the disadvantages from the publicity attendant to SORNA’s Internet requirements ‘are obvious’ and refusing to invalidate SORNA due to ‘wide dissemination’ of offender’s information, citing Smith); Hinckley, 550 F.3d at 937-38 (‘SORNA, just as the Smith scheme, merely provides for the “dissemination of accurate information about a criminal record, most of which is already public”’); see also United States v. Talada, 631 F. Supp. 2d 797, 808 (S.D. W. Va. 2009) (citing Smith and upholding SORNA as a valid regulatory program even though it requires widespread Internet dissemination of offenders’ information, a community notification program, and in-person reporting).
“Also persuasive is the Ninth Circuit’s 2012 decision upholding retroactive application of a Nevada statute that, among other tilings, not only required Internet publication of registration information, but also active notification to specified groups over and above what was required by SORNA, such as youth and religious organizations. Masto, 670 F.3d at 1051. In rejecting any notion that these features were akin to historical forms of punishment, the Ninth Circuit held:
‘Active dissemination of an individual’s sex offender status does not alter the [Smith] Court’s core reasoning that “stigma . . . results not from public display for ridicule and shaming but from the dissemination of accurate information about a criminal record, most of which is already public.” [Citation omitted.] Though “humiliation increases] in proportion to the extent of tlie publicity,” the “purpose and the principal effect of notification are to inform the public for its own safety.” [Citation omitted.]’ 670 F.3d at 1056.
“There is also recent state court authority, relying heavily on Smith, that holds posting registered offenders’ information on the Internet is not akin to traditional shaming punishments. See Kammerer v. State, 322 P.3d 827, 834-36 (Wyo. 2014) (‘Although dissemination of information relating to a registrant’s status as a sex offender may have negative consequences for the registrant, information regarding the offense is made public at the time of trial, and its publication under WSORA is merely a necessary consequence of the Act’s intent to protect the public from harm.’); State v. Letalien, 2009 ME 130, ¶ 38, 985 A.2d 4 (2009) (Internet posting of sex offender information is not punitive in purpose or effect, citing Smith; Maine and federal Ex Post Facto Clauses are coextensive); see also Doe I v. Williams, 2013 ME 24, ¶ 35, 61 A.3d 718 (2013) (following Letalien).
“I would follow this abundant caselaw and hold that KORA’s Internet posting of information is not akin to historical shaming punishments. And in reaching that conclusion, I would further note the majority’s discussion of the sharing functions available on dre Johnson County Sherriffs website is irrelevant to dre statute’s constitutionality because KORA does not require this capability; and, just as importantly, the majority cites no autirority that would find a federal ex post facto violation because of a nonstatutorily mandated software feature added by a local law enforcement agency.
*202 “Regardless, given the overwhelming weight and substance of the caselaw rejecting federal ex post facto challenges based on widespread Internet dissemination of offender registration information, as well as the federal courts’ more recent validations of Smith, I would not consider Smith’s rationale to be ‘antiquated’ or subject to easy dismissal, and I would not weigh this against the statute’s constitutionality. The majority errs in this regard.
“ ‘Branding’ a registrant’s driver’s license
“Next, the majority declares that KORA ‘mimics [the] shaming of old by branding tire driver’s license of a registrant with tire designation, “RO.” ’ 304 Kan. at 321. The majority is referring to K.S.A. 2011 Supp. 8-243, which provides that an offender’s driver’s license ‘shall be assigned a distinguishing number by the division [of motor vehicles] which will readily indicate to law enforcement officers that such person is a registered offender. The division shall develop a numbering system to implement the provisions of this subsection.’ This requirement, while not technically contained in KORA, differentiates Kansas laws from SORNA, although the statute only requires a distinguishing number and tire ‘RO’ practice is just a decision by a state agency that is not specifically dictated by tire statute. See K.S.A. 8-243(d).
“The majority draws support for its view from a divided decision in Starkey v. Oklahoma Dept. of Corrections, 2013 OK 43, 305 P.3d 1004 (2013), which considered the Oklahoma Constitution’s Ex Post Facto Clause. See Okla. Const., art. 2, § 15. But I do not find Starkey persuasive for several reasons.
“First, although the Oklahoma Supreme Court applied the intent-effects test, that court’s majority suggests they applied a lower standard as to when dre effects of a measure are punitive under the Oklahoma Ex Post Facto Clause by noting that the United States Constitution simply establishes a floor for constitutional rights in Oklahoma. 2013 OK 43, ¶ 45 (‘How we apply the “intent-effects” test is not governed by how the federal courts have independently applied the same test under dre United States Constitution as long as our interpretation is at least as protective as the federal interpretation.’). Second, Oklahoma’s offender registry law imposed harsher restraints on offenders because of residency boundaries (minimum distance from schools, playgrounds, etc.) and a requirement that Oklahoma driver’s licenses and identification cards spell out tire term 'Sex Offender.’ In contrast, KORA contains no residency exclusions and Kansas simply uses as a matter of state agency practice an abbreviation (RO), which applies equally to non-sex-offenders. Finally, tire Starkey court relied upon the totality of the Oklahoma law’s harsher circumstances when determining they weighed in favor of punishment. 2013 OK 43, ¶ 61 (‘[W]e are not making a determination of tire constitutionality of any of these individual registration requirements but for purposes of analyzing the second Mendoza-Martinez factor we find the totality of these requirements weigh in favor of punishment.’).
“Offering a different analysis, the Louisiana Supreme Court’s unanimous decision in Smith v. State, 84 So. 3d 487 (La. 2012), reached tire opposite conclusion *203 regarding its driver’s license labeling and is more on point. In so holding, the Louisiana court acknowledged that including the words ‘sex offender’ printed in orange color on an offender’s driver’s license ‘may be remotely similar to historical forms of punishment, such as public humiliation, [but] the immediate need for public protection was a corollary of, rather than an addendum to, the punishment for sex offenders.’ Smith, 84 So. 3d at 496 n.7-8, 498. The court then concluded that the requirement of a notation on an offender’s driver’s license ‘may be harsh, may impact a sex offender’s life in a long-lived and intense manner, and also be quite burdensome to the sex offender, [but] we do not find them to constitute an infringement of die principles of ex post facto.' 84 So. 3d at 499.
“Admittedly, the Louisiana court did not articulate whether it was relying on the federal or state constitution for its holding, but this does not appear to malee a difference because that court had previously held Louisiana’s Ex Post Facto Clause offers the same protections because it was patterned after the United States Constitution. See State ex rel. Olvieri v. State, 779 So. 2d 735 (La. 2001). For this reason, I find the Louisiana decision more persuasive than the Oklahoma decision.

“Quarterly Registration

“Next, the majority labels KORA’s quarterly, in-person registration requirements for each location where the offender works, lives, or attends school as ‘a traditional means of punishment’ by likening the requirement to probation or parole. 304 Kan. at 322. It does so without citation to any authority or explanation as to how quarterly reporting mandates offend federal ex post facto caselaw. Again, a review of the unanimous federal caselaw upholding SORNA is persuasive and leads to a contrary conclusion.
“SORNA’s in-person reporting requirements differentiate between types of sex offenses in determining the frequency of in-person reporting. There must be in-person verification ‘not less frequently than’ once a year for Tier I sex offenders, twice a year for Tier II sex offenders, and four times per year for Tier III sex offenders. 42 U.S.C. § 16916 (2012); see 42 U.S.C. § 16911 (definingTiers I, II, and III). In Parks, the First Circuit recently noted SORNA’s in-perSon requirement was ‘surely burdensome for those subject to it,’ but nevertheless concluded this was not punitive, noting:
‘To appear in person to update a registration is doubtless more inconvenient than doing so by telephone, mail or web entry; but it serves the remedial purpose of establishing that the individual is in the vicinity and not in some other jurisdiction where he may not have registered, confirms identity by fingerprints and records the individual’s current appearance. Further, the inconvenience is surely minor compared to the disadvantages of the underlying scheme in its consequences for renting housing, obtaining work and the like — consequences that were part of tire package that Smith itself upheld.’ 698 F.3d at 6.
See Doe v. Pataki, 120 F.3d 1263, 1281-82 (2d Cir. 1997); see also Doe v. Cuomo, *204 755 F.3d 105, 112 (2d Cir. 2014) (approving triennial, in-person reporting as being reasonably related to the nonpunitive, prospective goals of protecting the public and facilitating law enforcement efforts).
“Admittedly, KORA’s reporting requirements are more burdensome than those in SORNA because under KORA, all sex offenders are subject to in-person registration four times per year, and drug and violent offenders must report in person a minimum of three times per year. K.S.A. 2011 Supp. 22-4905(b). KORA further requires an offender to report registration changes in person ‘to the ... agency or agencies where last registered.’ (Emphasis added.) K.S.A. 2011 Supp. 22-4905(a), (g). In addition, the definition of ‘reside’ in KORA is broader than the definition in SORNA. Compare K.S.A. 2011 Supp. 22-4902(j) (definition of ‘reside’) with SORNA’s 42 U.S.C. § 16911. Therefore, it is obvious KORA imposes a greater registration burden on the offender than SORNA. But the question is whether the federal courts would view these changes as tipping the balance. I think not.
“Consider again as an example Matso in which the Ninth Circuit rejected a federal ex post facto challenge to a Nevada law that essentially mirrored SORNA’s registration requirements, but also expanded the category of individuals required to register, added to- the frequency offenders were subject to registration, and required in-person registration. Matso, 670 F.3d at 1051; see also Litmon, 768 F.3d at 1242-43 (holding California’s 90-day, in-person lifetime registration requirement does not violate federal ex post facto principles); Hatton, 356 F.3d at 965 (no evidence California's registration requirement has an objective to shame, ridicule, or stigmatize sex offenders). These decisions strongly point in a direction that indicates KORA’s reporting requirements do not offend federal ex post facto principles.
“Additionally, the majority’s analogy to probation is not persuasive. While probation/parole may have ‘reporting’ in common in the abstract, this is only one aspect of many conditions attached to these punishments. For example, probationers are subject to searches of their persons and property simply on reasonable suspicion of a probation violation or criminal activity and are subject to random drug tests. They may also be required to avoid ‘injurious or vicious habits’ and ‘persons or places of disreputable or harmful character’; permit state agents to visit their homes; remain in Kansas unless given permission to leave; work ‘faithfully at suitable employment’; perform community service; go on house arrest; and even serve time in a county jail. K.S.A. 2011 Supp. 21-6607(b), (c).
"In sum, I do not believe the federal courts, more specifically the United States Supreme Court, would hold that this historical-form-of-punishment factor weighs toward an ex post facto violation.
“Affirmative Disability or Restraint
“The majority focuses next on what it characterizes as the ‘more common restraint on an offender’s freedom of movement’ under KORA, which is the quarterly registration requirement in each applicable jurisdiction and the required $20 registration fee, as well as the KORA’s broader definition of the word ‘resides.’ *205 304 Kan. at 323. The majority notes the registration costs, depending on circumstances, could be $80 to $240 annually.
“But the majority fails to explain how the federal courts would hold that these components of KORA would weigh this factor against the Kansas law. For example, no evidence was presented establishing that the KORA registration costs were a fine instead of a fee. See Mueller v. Raemisch, 740 F.3d 1128, 1134 (7th Cir. 2014) (‘The burden of proving that it is a fine is on the plaintiffs ....’).
“In Mueller, the Seventh Circuit recently upheld Wisconsin’s annual $100 registration fee against a sex offender who moved out-of-state but was still required to register in Wisconsin. In doing so, tire court noted first that plaintiff had done nothing to get over the first hurdle by presenting evidence regarding the fee versus tire registration program’s cost. 740 F.3d at 1134 (‘[Tjhey cannot get to first base without evidence that it is grossly disproportionate to the annual cost of keeping track of a sex offender registrant — and they have presented no evidence of that either. They haven’t even tried.’). Similarly, Doe has done nothing as to this evidentiary hurdle, yet the majority strikes this factor against KORA even though the burden is on the challenger and the statute is presumed constitutional.
“Second, the Seventh Circuit noted the nonpunitive purpose of collecting fees and where the responsibility lies for having to provide a registry, stating:
‘The state provides a service to tire law-abiding public by maintaining a sex offender regstry, but there would be no service and hence no expense were there no sex offenders. As they are responsible for the expense, there is nothing punitive about requiring them to defray it.’ 740 F.3d at 1135.
“If it is the potential for a total annual cost of $240 that offends the majority, what is the legal basis for that? The majority leaves this unexplained.
“Next, die majority holds that housing and employment problems result from the regstry, which ties back to the widespread dissemination of information on the Internet discussed above, which Smith and tire other federal courts have plainly rejected. But the majority believes KORA suffers an additional evidentiary blow because of direct evidence that Doe actually lost a job and housing opportunities because of the Internet regstry. I disagree this tips the balance when tbe caselaw is considered.
“As noted earlier, my review of federal caselaw from Smith on down shows the courts have fully understood that actual consequences result from offender regstration and have not dismissed these consequences simply as conjecture. See, e.g., Smith, 538 U.S. at 99; Parks, 698 F.3d at 6 (‘The prospective disadvantages to Parks from such publicity are obvious.’). Indeed, several courts have approved state laws that imposed actual residential living restrictions on offenders, which are literally off-limits zones disabling offenders from living in close proximity to schools, playgrounds, etc. See Doe v. Miller, 405 F.3d 700 (8th Cir. 2005) (Iowa’s 2,000-foot buffer zone regulatory, not punitive); Salter v. State, 971 So. 2d 31 (Ala. Civ. App. 2007) (approving 2,000-foot buffer zone); People v. Leroy, 357 Ill. App. 3d 530, 828 N.E.2d 769 (2005) (approving 500-foot buffer zone); State v. Seering, *206 701 N.W.2d 655 (Iowa 2005) (upholding 2,000-foot buffer zone); see also Doe v. Bredesen, 507 F.3d 998, 1004 (6th Cir. 2007)(‘The [Tennessee] Act’s registration, reporting, and surveillance components are not of a type that we have traditionally considered as a punishment, and the district court correctly found that they do not constitute an affirmative disability or restraint in light of the legislature’s intent.’); Standley v. Town of Woodfin, 186 N.C. App. 134, 650 S.E.2d 618 (2007) (upholding ban on entering public park); Doe v. Baker, No. Civ. A. 1:05-CV-2265, 2006 WL 905368 (N.D. Ga. 2006) (unpublished opinion) (upholding 1,000-foot buffer zone). Clearly, such exclusions cause lost opportunities for housing and employment for offenders, yet these prohibitions were upheld as nonpunitive.
“I am not persuaded the federal courts would find KORA to impose requirements traditionally considered to be affirmative disabilities or restraints to the point of weighing this factor against constitutionality.
“Traditional Aims of Punishment
“The third Mendoza-Martinez factor is whether the ‘regulatory scheme . . . promotes the traditional aims of punishment.’ Smith, 538 U.S. at 97. The Court has described those aims as retribution and deterrence. See, e.g., Mendoza-Martinez, 372 U.S. at 168.
“The majority’s analysis of this factor is muddled and difficult to unpack. It is unclear to me whether the majority is relying on the articles attached to Doe’s summary judgment motion or its own intuition. As best as I can tell, the majority ultimately ignores the attachments and simply holds that KORA promotes traditional aims of punishment because the legislature increased the reporting term from 10 to 25 years. 304 Kan. at 325. But this conclusion is at odds with the federal caselaw.
“But the fact that KORA has a deterrent effect is not conclusive. The Smith Court found that ‘[a]ny number of government programs might deter crime without imposing punishment’ and ‘“[t]o hold that the mere presence of a deterrent purpose renders such sanctions ‘criminal’... would severely undermine the Government’s ability to engage in effective regulation.” [Citations omitted.]’ 538 U.S. at 102. The Court also rejected the lower court’s finding that Alaska’s registration obligations were retributive based upon the length of reporting differing between individuals convicted of nonaggravated offenses and those ‘convicted of aggravated or multiple offenses.’ 538 U.S. at 102. The Court found the ‘categories . . . and the corresponding length of the reporting requirement are reasonably related to the danger of recidivism, and this is consistent with the regulatory objective.’ (Emphasis added.) 538 U.S. at 102.
“The Smith Court’s analysis is equally applicable to KORA, though not wholly dispositive because the Court was addressing a 15-year registration requirement and KORA has a 25-year requirement. But SORNA imposes a 25-year registration requirement on Tier II offenders and a lifetime requirement on Tier III offenders, 42 U.S.C. § 16915 (2012), and the federal courts addressing this issue have upheld SORNA based on Smith.
*207 “The Eleventh Circuit addressed this registration requirement in W.B.H, and held that SORNA is no different than the Alaska act at issue in Smith. 664 F.3d at 858-59. The W.B.H. court reasoned that SORNA is ‘reasonably related to the danger of recidivism posed by sex offenders.’ 664 F.3d at 858. And the court explained that while SORNA ‘allows the public and law enforcement to determine the general whereabouts of convicted sex offenders,... it does not directly restrict their mobility, their employment, or how they spend their time.’ 664 F.3d at 858. So, the court found that any deterrent effect or purpose of SORNA does not justify a finding that the act’s purpose is punitive. 664 F.3d at 858; see also Under Seal, 709 F.3d at 265 (quoting from Smith to find that SORNA does not promote traditional aims of punishment).
“I would find under Smith and the cases interpreting SORNA that the traditional aims of punishment factor weighs in favor of KORA being fairly characterized as nonpunitive.
“Rational Connection to Nonpunitive Pukpose
“In Smith, the Court identified this as ‘a “most significant” factor in our determination that the statute’s effects are not punitive.’ 538 U.S. at 102 (citing United States v. Ursery, 518 U.S. 267, 290, 116 S. Ct. 2135, 135 L. Ed. 2d 549 [1996]). The Smith Court did not elaborate on what is meant by ‘rational connection to a nonpuntive purpose’ before analyzing the Alaska act under the standard. One commentator has noted that the standard is ‘deferential to the state purpose (much like rational basis review under substantíve due process analysis).’ Hobson, Banishing Acts: How Far May States Go to Keep Convicted Sex Offenders Away from Children?, 40 Ga. L. Rev. 961, 984 (2006). In State v. Cook, 286 Kan. 766, 774, 187 P.3d 1283 (2008), this court determined that ‘the registration act was intended to promote public safety and to protect the public from sex offenders, who constitute a class of criminals that is likely to reoffend.’
“The majority concludes that arguably under the current version of KORA, ‘public safety has become a pretext.’ 304 Kan. at 326. The majority finds fault with KORA because it does not distinguish between types of offenders and contains no mechanism for relieving a ‘fully rehabilitated’ offender from its notification burdens. But the Ninth Circuit and others have rejected similar arguments. In Matso, the court held:
‘Plaintiffs argue Smith overstated the risk of sex-offender recidivism. They note that Smith cited several studies on sex offender recidivism. See id. at 104. Plaintiffs then rely on an expert declaration critiquing the methodology of the recidivism studies in Smith. The district court did not make any factual finding regarding the risk of sex offender recidivism. Even had it adopted the declaration’s conclusions as its own, a recalibrated assessment of recidivism risk would not refute the legitimate public safety interest in monitoring sex-offender presence in the community.’ 670 F.3d at 1057.
See also Bredesen, 507 F.3d at 1006 (Tennessee Legislature ‘could rationally conclude that sex offenders present an unusually high risk of recidivism, and that *208 stringent registration, reporting, and electronic surveillance requirements can reduce that risk and thereby protect the public’ and concluding that ‘[w]here there is such a rational connection to a nonpunitive purpose, it is not for the courts to second-guess the state legislature’s policy decision’). In addition, the Second Circuit recently held the New York Legislature’s ‘decision to eliminate the possibility of relief from registration for twenty years’ for level one offenders did not render the registration provisions punitive. Cuomo, 755 F.3d at 112.
“The majority fails to cite any authority for its analysis of this factor; and the proposition that offender registration schemes are rationally related to the nonpu-nitive purpose of public safety finds overwhelming approval in the federal caselaw. Even Myers, 260 Kan. at 681, appears to assume offender registration is rationally connected to public safety, and the Alaska state case that held post-Smith changes to the Alaska act were an ex post facto violation admits registration, at least as to sex offenders, advances a nonpunitive public safety purpose. See Doe v. State, 189 P.3d 999, 1015-16 (Alaska 2008).
“I do not see how the majority can say no public safety purpose is rationally furthered by having sex, drug, and violent offenders register. I would follow tire referenced precedent and hold that KORA has a rational connection to a nonpu-nitive purpose, so this factor does not weight towards punishment.
“Excessive in Relation to Regulatory Purpose
“In Smith, die Court clarified that ‘[tjhe excessiveness inquiry of our ex post facto jurisprudence is not an exercise in determining whether die legislature has made the best choice possible to address the problem it seeks to remedy. The question is whether the regulatory means chosen are reasonable in fight of the nonpunitive objective.’ 538 U.S. at 105. The Smith Court further noted that ex post facto jurisprudence does not preclude a state from making reasonable categorical judgments that certain crimes should have particular regulatory consequence.
“Instead of independently analyzing this factor, the majority merely harkens back to the ground it already plowed, concluding: ‘Our discussion of the other factors has touched upon the excessive nature of KORA.’ 304 Kan. at 327. The majority then specifically cites the fact that the 2011 KORA amendments required more information from die offenders and that the penalty for noncompfiance has increased. 304 Kan. at 327. I would hold that neither of these requirements is excessive given KORA’s public safety purpose based on the authority cited above.
“Conclusion
“Although the 2011 KORA offender registration scheme imposes a number of burdens on sex offenders, I believe the applicable federal caselaw considering similar burdens under other offender registration schemes compels us to conclude that the 2011 KORA amendments do not violate the United States Constitution’s Ex Post Facto Clause as applied to sex offenders and that the United States Supreme Court would so hold.” Doe v. Thompson, 304 Kan. at 328-46. (Biles, J., concurring in part and dissenting in part).
*209 Because we conclude the registration requirements Petersen-Beard complains of are not punishment, his claim that those requirements violate the Eighth Amendment’s prohibition against cruel and unusual punishment cannot survive.

KORA’s lifetime sex offender registration requirements are not punishment for purposes of applying the Kansas Constitution.

Having held that KORA’s lifetime sex offender registration requirements are not punishment for purposes of applying our federal Constitution, we must next consider whether those same requirements might still be punishment for purposes of applying the Kansas Constitution. We conclude they are not.
Section 9 of the Kansas Constitution Bill of Rights provides that “[a]ll persons shall be bailable by sufficient sureties except for capital offenses, where proof is evident or the presumption great. Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted.”
“This court . . . can construe [its] state constitutional provisions independent of federal interpretation of corresponding provisions.” State v. Schultz, 252 Kan. 819, 824, 850 P.2d 818 (1993). While we have the freedom to extend greater protection to Kansas citizens under the Kansas Constitution than exists under comparable provisions of the federal Constitution, we generally have not done so. See State v. Spain, 269 Kan. 54, 59, 4 P.3d 621 (2000); Murphy v. Nelson, 260 Kan. 589, 597, 921 P.2d 1225 (1996); State v. Morris, 255 Kan. 964, 981, 880 P.2d 1244 (1994); Schultz, 252 Kan. at 826.
However, we have shown a willingness to evaluate § 9 under a separate analytical framework. See State v. Mossman, 294 Kan. 901, 924, 281 P.3d 153 (2012) (explaining how proportionality analysis can differ between the two clauses). In this instance, however, we find no textual or historical evidence that the drafters of § 9 intended the meaning of “punishment” to differ from the same word’s meaning as used in the Eighth Amendment to the United States Constitution.
The origins of the Eighth Amendment and similar state prohibitions (“punishments clauses”), such as § 9 of the Kansas Bill of Rights, are in the 1689 English Bill of Rights. See, e.g., Harmelin *210 v. Michigan, 501 U.S. 957, 966, 111 S. Ct. 2680, 115 L. Ed. 2d 836 (1991); Solem v. Helm, 463 U.S. 277, 285 n.10, 103 S. Ct. 3001, 77 L. Ed. 2d 637 (1983); 3 Story, Commentaries on the Constitution of the United States § 1896 (1833). By 1791, five state constitutions prohibited “cruel or unusual punishments.” See Del. Declaration of Rights, sec. 16 (1776); Md. Declaration of Rights, art. 22 (1776); Mass. Declaration of Rights, art. XXVI (1780); N.C. Declaration of Rights, sec. 10 (1776); N.H. Bill of Rights, art. 33 (1784). Two others prohibited “cruel” punishments. See Pa. Const., art. IX, sec. 13 (1790); S.C. Const., art. IX, sec. 4 (1790). The Eighth Amendment most closely followed the Virginia Declaration of Rights, which prohibited “cruel and unusual” punishment. Va. Declaration of Rights, sec. 9 (1776).
The Kansas Bill of Rights, adopted as part of the Wyandotte Constitutional Convention of 1859, was modeled after tire Ohio Bill of Rights, although there were “a few transpositions and changes in phraseology.” Perdue, The Sources of the Constitutions of Kansas, reprinted in 7 Kansas Historical Collections 130-151 (1902). Ohio had created a new constitution in 1851 and its punishments clause read: “All persons shall be bailable by sufficient sureties, except for capital offences where the proof is evident, or the presumption great. Excessive bail shall not be required; nor excessive fines imposed; nor cruel and unusual punishments inflicted.” Ohio Const., art. I, § 9 (1851). Our § 9 tracks Ohio’s § 9, but for one key distinction: “or” vs. “and.” While this textual difference may support a divergent application of § 9 in some cases, it is immaterial to our decision today.
The record regarding the adoption of the Kansas Bill of Rights— and § 9 in particular — is scarce. We can find no textual or historical reason to depart from our general practice of giving an identical interpretation to identical language appearing in both the Kansas Constitution and our federal Constitution. There is no evidence that the word “punishment” meant anything different to the drafters of tire Kansas Constitution than it did to the framers of the Bill of Rights. Therefore, we conclude the term punishment has the same meaning in § 9 as it does in the Eighth Amendment. Because we have held that KORAs sex offender registration requirements *211 do not qualify as punishment as that word is used in the Eighth Amendment, we likewise conclude that those requirements are not punishment as that word is used in § 9.
Affirmed.
# ⅜⅛ #