NOT DESIGNATED FOR PUBLICATION

No. 115,937

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JASON L. JEARDOE,
*Appellant*.

MEMORANDUM OPINION

Appeal from Ottawa District Court; RENE S. YOUNG, judge. Opinion filed October 20, 2017. Affirmed.

*Nels P. Noel*, of Concordia, for appellant.

*Kristafer R. Ailslieger*, deputy solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before STANDRIDGE, P.J., HILL and SCHROEDER, JJ.

PER CURIAM: Jason L. Jeardoe appeals following convictions of two counts of involuntary manslaughter while driving under the influence of alcohol and one count of driving left of center. Specifically, Jeardoe claims (1) the district court erred in failing to suppress the results of blood-alcohol testing administered to him at the hospital after the accident and (2) the evidence presented at trial was insufficient to support his two convictions for involuntary manslaughter. But the district court properly held the good-faith exception to the exclusionary rule applies in this case, which ultimately rendered admissible the results of his blood-alcohol testing. With regard to the convictions for

1

involuntary manslaughter, we have reviewed the record and find sufficient evidence to support the jury's findings. Accordingly, we affirm.

FACTS

On April 11, 2014, Jeardoe was driving a 2014 Chevrolet truck westbound on K-18, a two-lane highway. At some point, Jeardoe moved into the eastbound lane, where he had a head-on collision with a 1998 Plymouth Neon driven by Emma Pisocki. Emma's father, Jason Pisocki, was in the passenger seat. Both Emma and Jason were killed in the accident. Following the accident, law enforcement observed that Jeardoe exhibited signs of impairment, including a strong odor of alcohol on his person, bloodshot and watery eyes, and mumbled and slurred speech. In addition, law enforcement noticed beer cans at the scene that appeared to have come from Jeardoe's truck.

Jeardoe was transported to the hospital, where Kansas Highway Patrol Trooper Greg Arnold gave Jeardoe both oral and written implied consent advisories listed in the DC-70 form. Jeardoe consented to a blood test, which revealed that his blood-alcohol level was .109 grams ethyl alcohol per 100 milliliters of blood. The State charged Jeardoe with two counts of involuntary manslaughter while driving under the influence of alcohol and one count of driving left of center.

Jeardoe filed a motion to suppress the blood test results, arguing that his consent to the blood draw was coerced in light of the Kansas Supreme Court's decisions in *State v. Ryce*, 303 Kan. 899, 368 P.3d 342 (2016), *aff'd on rehearing* 306 Kan. 682, 396 P.3d 711 (2017), and *State v. Nece*, 303 Kan. 888, 367 P.3d 1260 (2016), *aff'd on rehearing* 306 Kan. 679, 396 P.3d 709 (2017). In *Ryce*, the Supreme Court held that K.S.A. 2014 Supp. 8-1025, which imposes criminal penalties upon a motorist for refusing to submit to any method of blood-alcohol testing, is facially unconstitutional because the statute is not narrowly tailored to serve a compelling state interest. 303 Kan. at 963. In *Nece*, the court

2

held that a driver's consent to a breath test premised on the threat of criminal prosecution for test refusal "was unduly coerced because, contrary to the informed consent advisory, the State could not have constitutionally imposed criminal penalties if [the driver] had refused to submit to breath-alcohol testing." 303 Kan. at 889.

In response to Jeardoe's argument at the suppression hearing, the State did not dispute that the implied consent advisory given to Jeardoe was inherently coercive under *Ryce* and *Nece*, rendering Jeardoe's consent to the blood draw involuntary. The State asserted the results of Jeardoe's blood test should still be admissible, however, under the good-faith exception to the exclusionary rule. The district court ultimately was persuaded by the State's argument, ruling that the implied consent advisory's coercive nature rendered Jeardoe's consent to the blood draw involuntary but that the good-faith exception to the exclusionary rule applied. Accordingly, the district court denied Jeardoe's motion to suppress.

The jury subsequently found Jeardoe guilty as charged. The district court sentenced him to a controlling term of 195 months in prison with a postrelease supervision term of 36 months.

ANALYSIS

Jeardoe raises two issues on appeal. First, he argues the district court erred in applying the good-faith exception to the exclusionary rule. Second, Jeardoe contends the evidence was insufficient to support his involuntary manslaughter convictions. We address each of these issues in turn.

*Motion to suppress*

Jeardoe argues the district court erred in denying his motion to suppress. Jeardoe claims, as he did below, that his consent to the blood draw was involuntary due to the coercive nature of the implied consent advisory and that the district court erred in allowing the blood test results to be admitted under the good-faith exception to the exclusionary rule. In addition to filing a motion to suppress, Jeardoe contemporaneously objected to the admission of the results of the blood test at trial, thereby preserving this issue for appeal. See *State v. Richard*, 300 Kan. 715, 726, 333 P.3d 179 (2014) (when district court denies motion to suppress, moving party must object to introduction of that evidence at time it was offered at trial to preserve issue for appeal). Where, as here, the material facts to a district court's decision on a motion to suppress evidence are not in dispute, the question of whether to suppress is a question of law over which an appellate court has unlimited review. *State v. Cleverly*, 305 Kan. 598, 604, 385 P.3d 512 (2016).

K.S.A. 2016 Supp. 8-1025, which became effective on July 1, 2012, criminalizes the refusal to submit to a test to determine the presence of alcohol or drugs under certain circumstances, including when the driver has a prior conviction of DUI or a prior test refusal. K.S.A. 2016 Supp. 8-1001, known as the Kansas Implied Consent Law, states that before a breath, blood, or urine test can be administered to a driver, a law enforcement officer is required to give oral and written notice that refusing to submit to the test is a crime if the driver has a prior conviction of DUI or a prior test refusal. K.S.A. 2016 Supp. 8-1001(k)(4). Here, Jeardoe had prior DUI convictions, so the threat of criminal sanctions for refusing to submit to a test applied to him.

Based on our Supreme Court's holdings in *Ryce* and *Nece*, the district court ruled that the implied consent advisory's coercive nature rendered Jeardoe's consent to the blood draw involuntary. The parties do not challenge the district court's ruling on this point. Notably, the district court's ruling was later reinforced by the United States

4

Supreme Court's holding that motorists may not be criminally punished for refusing to submit to a warrantless blood draw and that consent to a warrantless blood test cannot be premised on a threat of criminal penalties for refusal to submit to the test. See *Birchfield v. North Dakota*, 579 U.S. __, 136 S. Ct. 2160, 2185-86, 195 L. Ed. 2d 560 (2016). In light of *Birchfield*, the Kansas Supreme Court recently affirmed on rehearing its holdings in *Ryce* and *Nece*. See *State v. Ryce*, 306 Kan. 682, 396 P.3d 711 (2017); *State v. Nece*, 306 Kan. 679, 396 P.3d 709 (2017).

Because there is no dispute that Jeardoe's consent to the blood draw was coercive, and thus involuntary, the issue before us is whether the district court erred in allowing the evidence of Jeardoe's blood test to be admitted under the good-faith exception to the exclusionary rule. The application of this exception is a question of law subject to unlimited review. See *State v. Carlton*, 297 Kan. 642, 645-46, 304 P.3d 323 (2013).

The exclusionary rule is a judicially fashioned remedy which prevents the State from using evidence obtained in violation of the Fourth Amendment to the United States Constitution against the subject of the illegal search in a criminal proceeding. *State v. Pettay*, 299 Kan. 763, 768, 326 P.3d 1039 (2014). The rule aims to protect Fourth Amendment rights through deterrence. *State v. Daniel*, 291 Kan. 490, 496, 242 P.3d 1186 (2010). There is a good-faith exception to the exclusionary rule when law enforcement reasonably relies, in objective good faith, on a statute later declared unconstitutional:

> "The application of the exclusionary rule to suppress evidence obtained by an officer acting in objectively reasonably reliance on a statute would have as little deterrent effect on the officer's actions as would the exclusion of evidence when an officer acts in objectively reasonable reliance on a warrant. Unless a statute is clearly unconstitutional, an officer cannot be expected to question the judgment of the legislature that passed the law. If the statute is subsequently declared unconstitutional, excluding evidence obtained pursuant to it prior to such a judicial declaration will not deter future Fourth Amendment violations by an officer who has simply fulfilled his responsibility to enforce the statute

5

as written." *Illinois v. Krull*, 480 U.S. 340, 349-50, 107 S. Ct. 1160, 94 L. Ed. 2d 364 (1987).

In *Daniel*, our Supreme Court expressly adopted the exception to the exclusionary rule set out in *Krull*. See *Daniel*, 291 Kan. at 500. The court noted that the exception is not unlimited but rather is constrained by the requirement that the officer's reliance on the statute be objectively reasonable. 291 Kan. at 500 (citing *Krull*, 480 U.S. at 355). The court noted that whether an officer's reliance on a statute was objectively reasonable depends on whether the officer should have known that the statute was unconstitutional and whether the Legislature "'wholly abandoned its responsibility to enact constitutional laws'" when it passed the statute in question. 291 Kan. at 500 (quoting *Krull*, 480 U.S. at 355).

In applying the good-faith exception to the blood evidence in this case, the district court determined that Trooper Arnold's reliance on K.S.A. 2013 Supp. 8-1025 was objectively reasonable. The court found that when Arnold provided the implied consent advisories to Jeardoe, Arnold was following the law as it existed at that time and could not reasonably be expected to know that the statute later would be found unconstitutional. The court further found that the Legislature did not wholly abandon its responsibility to pass constitutional laws, noting that other states had enacted similar laws imposing criminal penalties for refusing to submit to blood-alcohol testing.

As noted by the State, another panel of this court addressed the very issue presented here in a published decision, holding that where a law enforcement officer requested a motorist to submit to a warrantless blood test in reliance on the Kansas Implied Consent Law prior to the United States Supreme Court's decision in *Birchfield*, the results of the blood test were admissible under the good-faith exception to the exclusionary rule. See *State v. Schmidt*, 53 Kan. App. 2d 225, 385 P.3d 936 (2016), *petition for rev. filed* January 13, 2017. Other panels of this court have relied on *Schmidt*

to reach the same result. See *State v. Soukup*, No. 116,913, 2017 WL 2403310, at *3 (Kan. App. 2017) (unpublished opinion), *petition for rev. filed* June 26, 2017; *State v. McClellan*, No. 115,164, 2017 WL 839720, at *14 (Kan. App. 2017) (unpublished opinion), *petition for rev. filed* March 31, 2017; see also *State v. Kraemer*, 52 Kan. App. 2d 686, 697-99, 371 P.3d 954 (2016), *petition for rev. filed* May 31, 2016 (applying good-faith exception in circumstance where law enforcement officer obtained consent to breath testing after reading implied consent advisory).

In order to determine whether the district court properly applied the good-faith exception in this case, we must first assess whether Trooper Arnold should have reasonably known that the implied consent advisories were unconstitutional. Then, we must determine whether the Legislature wholly abandoned its responsibility to pass constitutional legislation relating to the implied consent advisories. See *State v. Meitler*, 51 Kan. App. 2d 308, 314, 347 P.3d 670, *rev. denied* 302 Kan. 1017 (2015).

Citing Trooper Arnold's testimony at the suppression hearing, Jeardoe claims Arnold reasonably should have known the implied consent advisories were unconstitutionally coercive. Based on this claim, Jeardoe contends that Trooper Arnold cannot be said to have acted in good faith in relying on the statute. But Jeardoe's argument mischaracterizes the nature of Arnold's testimony. During cross-examination, defense counsel elicited testimony from Arnold that he believed, based on his law enforcement training, it was inappropriate to threaten someone with additional penalties for refusing to comply with requests from law enforcement. Arnold further agreed that he had informed Jeardoe, in the form of the implied consent advisories, that additional penalties could be imposed for refusing to consent to a blood draw. Arnold did not testify that at the time of Jeardoe's accident, he knew or believed that K.S.A. 2013 Supp. 8-1025 was unconstitutional or that the implied consent advisories were unconstitutionally coercive. Rather, Arnold merely agreed, in the abstract, that threatening an individual

with additional penalties for refusing to respond to law enforcement questioning or refusing to consent to a search of his or her home or person could be viewed as coercive.

At the time of Jeardoe's accident in April 2014, Trooper Arnold was required by K.S.A. 2013 Supp. 8-1001(k)(4) to inform Jeardoe that he could face criminal penalties if he refused to submit to any method of blood-alcohol testing. Also at that time, Kansas courts had "often note[d] that the 'coercive' effect of informing a suspect of the negative legal consequences of refusing to consent to blood-alcohol testing . . . [did] not render consent involuntary as long as the information about the negative consequences was accurate." *Nece*, 303 Kan. at 890. There is no evidence in the record to establish Arnold had reason to know that the implied consent advisories later would be found impermissibly coercive. And K.S.A. 2013 Supp. 8-1025 was not so clearly unconstitutional at the time of Jeardoe's accident that a reasonably well-trained officer would have known that it was unconstitutional. By providing the advisories and informing Jeardoe that he could be charged with a separate crime for refusing to submit to the blood test, Arnold was "simply fulfill[ing] his responsibility to enforce the statute as written." See *Krull*, 480 U.S. at 350.

Next, we must consider whether the Legislature wholly abandoned its responsibility to pass constitutional legislation relating to the implied consent advisories. Jeardoe advances no real argument on this issue. A point raised incidentally in a brief and not argued therein is deemed abandoned. *State v. Sprague*, 303 Kan. 418, 425, 362 P.3d 828 (2015).

But even if Jeardoe had presented an argument on this issue, there is no indication that in enacting either K.S.A. 2016 Supp. 8-1025 or K.S.A. 2016 Supp. 8-1001(k)(4) the Kansas Legislature wholly abandoned its responsibility to pass constitutional laws. We will generally presume that the Legislature acts with adequate knowledge of its statutory subject matter, including prior and existing law, and judicial decisions interpreting the

8

same. *State v. Kershaw*, 302 Kan. 772, 782, 359 P.3d 52 (2015). We will further presume that statutes passed are constitutional. *State v. Petersen-Beard*, 304 Kan. 192, 194, 377 P.3d 1127, *cert. denied* 137 S. Ct. 226 (2016).

In *Meitler*, this court noted that "the Kansas implied consent law was originally passed by the legislature in 1955[,] . . . [and] [s]ince that time, although it has undergone numerous amendments, officers have become accustomed to the statutory scheme which has essentially remained the same over the years." 51 Kan. App. 2d at 316. The *Meitler* court further acknowledged that "in the 28 years since *Krull* was issued, there does not appear to be any reported cases wherein a federal or state appellate court declined to apply the good-faith exception because a legislative body wholly abandoned its responsibility to enact constitutional laws." 51 Kan. App. 2d at 317. As the United States Supreme Court stated in *Krull*, "the exclusionary rule [is] aimed at deterring police misconduct. . . . [L]egislators, like judicial officers, are not the focus of the rule." 480 U.S. at 350. Other states also had statutes similar to K.S.A. 2016 Supp. 8-1025 and continued to uphold them until the United States Supreme Court ruled in *Birchfield* that these types of criminal penalty laws are unenforceable as to blood tests. See, e.g., *Wing v. State*, 268 P.3d 1105, 1109-10 (Alaska App. 2012) (upholding constitutionality of Alaska statute criminalizing refusal to submit to blood-alcohol test); *State v. Bernard*, 859 N.W.2d 762, 774 (Minn. 2015) (Minnesota statute criminalizing refusal to submit to blood-alcohol test passes rational basis review). For all these reasons, it cannot be said that the Kansas Legislature wholly abandoned its responsibility to pass constitutional legislation relating to the implied consent law.

Under the circumstances present here, Arnold's reliance on K.S.A. 2013 Supp. 8-1025 was objectively reasonable. There is no indication he should have known that the implied consent advisories were unconstitutional. Nor is there any indication that the Kansas Legislature wholly abandoned its responsibility to pass constitutional legislation. Suppression of the evidence in this case would not serve the deterrent aim of the

9

exclusionary rule. As a result, the district court did not err in applying the good-faith exception and denying Jeardoe's motion to suppress.

*Sufficiency of the evidence*

Jeardoe contends the evidence was insufficient to support his convictions for involuntary manslaughter because the blood test results were not reliable. Jeardoe suggests that other than the blood test results, there was very little evidence of his intoxication.

When the sufficiency of the evidence is challenged in a criminal case, an appellate court will review all evidence in the light most favorable to the State. An appellate court will uphold the conviction if it is convinced that a rational fact-finder could have found the defendant guilty beyond a reasonable doubt based on the evidence presented at trial. *State v. Rosa*, 304 Kan. 429, 432-33, 371 P.3d 915 (2016). It is generally not within the authority of an appellate court to reweigh the evidence or assess the credibility of witnesses. *State v. Daws*, 303 Kan. 785, 789, 368 P.3d 1074 (2016).

K.S.A. 2013 Supp. 21-5405(a)(3), the statute under which Jeardoe was charged, states that "[i]nvoluntary manslaughter is the killing of a human being committed: . . . in the commission of . . . an act described in K.S.A. 8-1567." The State charged Jeardoe under two alternative theories: (1) that the killing was done while Jeardoe was operating a vehicle in this state while having an alcohol concentration in his blood of .08 or more as measured within three hours of the time of operating the vehicle, contrary to K.S.A. 2013 Supp. 8-1567(a)(2) or (2) that the killing was done while operating a vehicle under the influence of alcohol to a degree that rendered Jeardoe incapable of safely driving a vehicle, contrary to K.S.A. 2013 Supp. 8-1567(a)(3). The jury found Jeardoe guilty under both theories.

10

Jeardoe's sufficiency argument challenges the jury's finding of guilt under K.S.A. 2013 Supp. 8-1567(a)(2) by claiming that the blood test results were not reliable. Specifically, Jeardoe alleges that because his blood sample was left in Trooper Arnold's police car for 41 days before it was sent to the Kansas Bureau of Investigation (KBI) for testing, the sample could have fermented, possibly causing a false positive test. Jeardoe also claims that the headspace gas chromatograph used by the KBI to analyze his blood sample was not working properly. This claim is based on the testimony of his expert witness, Dr. Jimmie Valentine, who testified that the blood test results demonstrated "tailing," which is an indicator of co-elution, meaning that a substance other than ethanol was being tested.

But Jeardoe's arguments are no more than an invitation to reweigh the evidence, which we cannot do. See *Daws*, 303 Kan. at 789. Whether the blood test results were reliable was a question for the jury to resolve. In addition to Valentine's testimony regarding the possibility of fermentation in the blood sample and a malfunctioning headspace gas chromatograph, the jury also heard testimony from JaQueya Ogilvie, the KBI forensic scientist who analyzed Jeardoe's blood sample. Ogilvie testified that she had no unusual concern with the length of time it took Jeardoe's sample to reach the lab and that she did not notice anything abnormal about the sample. Ogilvie stated that while refrigeration of a sample prior to its arrival at the lab was helpful, it was not required. Ogilvie agreed that storing a sample in a car for a long period of time could possibly result in fermentation or bacterial growth but explained that preservatives in the blood sample tubes help to minimize these possibilities. The fact that the sample was in Trooper Arnold's car for an extended period of time did not cause Ogilvie to believe that the test results were flawed. Ogilvie also testified about the headspace gas chromatograph used to test Jeardoe's sample and the various methods she used to validate the instrument to ensure it was working properly prior to testing the sample. Ogilvie stated that the minimal "tailing" observed by Valentine did not indicate any co-elution in Jeardoe's blood test.

11

The jury clearly resolved the conflicting evidence relating to the blood test results in favor of the State. The evidence was sufficient to support Jeardoe's convictions for involuntary manslaughter committed while violating K.S.A. 2013 Supp. 8-1567(a)(2).

Affirmed.