NOT DESIGNATED FOR PUBLICATION

No. 115,441

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

KEN'DUM DAN'SHA OWENS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; WILLIAM S. WOOLLEY, judge. Opinion filed September 15, 2017. Affirmed.

*Clayton J. Perkins*, of Kansas Appellate Defender Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before PIERRON, P.J., GREEN and HILL, JJ.

PER CURIAM:  Following a jury trial, Ken'dum Dan'sha Owens was convicted of aggravated robbery, criminal possession of a firearm, and criminal deprivation of property. Owens now appeals his convictions, asserting that reversal is required for the following reasons:  (1) the State violated his constitutional speedy trial right; (2) the State used an unnecessarily suggestive eyewitness identification to support his convictions; and (3) the State committed prosecutorial error during closing arguments. Owens then asserts that if the preceding errors do not individually require reversal, reversal is required when the errors are considered cumulatively. Finally, Owens argues that the trial court violated his right to a jury trial under the Sixth Amendment to the United States Constitution as

1

stated in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), when it ruled that he must register as a violent offender under the Kansas Offender Registration Act (KORA). For the reasons stated below, we reject Owens' arguments. As a result, we affirm Owens' convictions and sentences.

Around 11:15 p.m. on February 16, 2012, Nathan Davis parked his white 1997 Nissan Maxima in his apartment complex's parking lot. Immediately after he exited his car, two men approached Davis. One of the men pointed a silver gun at Davis, telling him to hand over his car keys. Davis complied, and the men took his keys, got into his Maxima, and drove off. Davis used his cell phone to call 911. Davis told the 911 dispatcher that the man, who appeared to be a black male around 20 to 22 years old, about 6 feet tall, and of a stocky build, approached him with a gun. Davis also explained that the man with the gun was wearing a black hooded sweatshirt, a red or black baseball cap, and blue jeans.

The dispatcher relayed this information over police radio. As the information was relayed over police radio, Officer Brent Johnson, who was already in the area of Davis' apartment complex, saw a white Nissan Maxima stopped in the middle of the street. Officer Johnson activated his patrol car's lights and sirens. Immediately after activating his lights and sirens, the man in the driver's seat of the Maxima got out of the car and started running. Officer Johnson chased the man through a residential neighborhood but lost sight of him after about 5 minutes. Officer Johnson described the man running from him as a black male wearing a black jacket, a red baseball cap, and blue jeans. Officer Johnson further noticed that the man was wearing white tennis shoes.

After losing sight of the man, Officer Johnson created a perimeter around the houses where he had determined the man was likely hiding. Soon after, Officer Jesse Hancock and his K-9 partner started searching for the man within the perimeter. At about 11:45 p.m., Officer Hancock and his K-9 partner found a black male wearing a black hooded zipped sweatshirt, white tennis shoes, and bright colored pajama pants hiding

behind a tree in a backyard inside the perimeter. A red and black baseball cap was found in the same backyard, and a silver gun was found in the yard of a nearby house. The man hiding behind the tree was later identified as Owens. The police brought Owens to Davis, and Davis identified Owens as the man who had robbed him at gunpoint.

The State charged Owens with one count of aggravated robbery, criminal possession of a firearm, and criminal deprivation of property. Although Owens was only 17 years old when he allegedly committed these crimes, Owens stipulated to the State's motion to try him as an adult.

On May 30, 2013, Owens moved pro se for new counsel. In this motion, Owens alleged many things, including that his current counsel, Pamela Parker, had continued his case multiple times without his consent. On June 14, 2013, the trial court held a hearing on this motion. During that hearing, Owens agreed to withdraw his motion on the condition that Parker would set his case for trial sometime in July or August 2013. The trial court told Owens that if he was dissatisfied with Parker's representation in the future, he could refile his motion for new counsel.

Owens' jury trial was ultimately held between September 23, 2013, and September 25, 2013. At his trial, Officer Johnson described the man who ran from Davis' car. Davis described the man who pointed a gun at him and stole his keys in the same manner he described him to 911 dispatch. Both Davis and Officer Johnson testified that the man they saw was Owens. In addition to this testimony, another police officer testified about a cell phone being found inside Davis' car. The cell phone was password protected, and the police officer was unable to unlock the phone because of the password. But the police officer explained that he removed the cell phone's SD card and viewed everything that had been saved onto the SD card. Many photos of Owens had been saved onto the cell phone's SD card. These photos, as well as the clothes Owens was wearing when arrested, the red and black baseball cap, and silver gun were admitted into evidence.

3

The only evidence Owens presented on his behalf came in the form of his own testimony. Owens testified that around 6 or 7 p.m. on February 12, 2012, he went to the apartment of a friend, "JR," to play videogames. JR allegedly lived in the same apartment complex as Davis. Owens testified that he and JR played videogames for a while and then went to a nearby park to play basketball. He explained that when he played basketball, he "[t]ook off [his] jacket, hat, [and] pants." He stated that he played basketball in pajama pants and a t-shirt, putting his belt around the top of his pajama pants to keep the pants from falling down. He stated that he put his jacket, hat, and pants as well as his cell phone and wallet under a tree near the basketball court. Owens testified that when he was done playing basketball, he went to retrieve these items, but his pants, cell phone, and wallet were missing.

Owens testified that after realizing that his belongings were missing, he and JR went back to JR's apartment, where at about 11 p.m., someone called JR's cell phone. He alleged that this unknown caller told him that if he wanted his clothes, cell phone, and wallet back, he needed to go back to the park and wait. He stated that at this point, he and JR went back to the park, waiting for someone to arrive with his belongings. He explained that while they were waiting, he saw police lights and "took off running." He explained that he ran because he was out past curfew. According to Owens, he then "ran through some backyards" before stopping in "some backyard," where he sat beneath a tree. He stated that he was "just sitting there" when "the police came in." Owens denied pointing a gun at Davis or stealing Davis' car keys, but he admitted that the red and black baseball cap found in the yard he was hiding in and that the cell phone found in Davis' car belonged to him.

The jury found Owens guilty on all counts.

After his trial, Owens moved pro se for dismissal of his case. He complained about Parker's representation and the continuances she filed on his behalf. Within this motion, he also alleged that his constitutional speedy trial right had been violated. The trial court

rejected Owens' arguments. The trial court sentenced Owens to a controlling sentence of 206 months' imprisonment followed by 36 months' postrelease supervision. Because Owens had committed the aggravated robbery with a gun, the trial court ordered that Owens register as a violent offender for 15 years following his prison discharge date as required by K.S.A. 2011 Supp. 22-4902(e)(2).

This court retained Owens' untimely notice of appeal because the trial court found that one of the exceptions as stated in *State v. Ortiz*, 230 Kan. 733, 640 P.2d 1255 (1982), existed.

*Was Owens' Constitutional Speedy Trial Right Violated?*

As he did below, Owens argues that his constitutional speedy trial right was violated. The State counters that Owens has failed to establish that the delay he experienced was presumptively prejudicial. Alternatively, the State argues that even if the length of delay was presumptively prejudicial, there were legitimate reasons for the delay of his trial, rendering his constitutional speedy trial violation claim meritless.

*Applicable Law*

"Whether a defendant's constitutional right to a speedy trial has been violated is a question of law over which an appellate court has unlimited review." *State v. Waldrup*, 46 Kan. App. 2d 656, 676, 263 P.3d 867 (2011).

The State bears the burden to ensure that a defendant's case is prosecuted in a manner consistent with a defendant's right to a speedy trial under the Sixth Amendment to the United States Constitution. See *State v. Rivera*, 277 Kan. 109, 112, 83 P.3d 169 (2004). In describing the test for determining whether the State complied with their burden, our Supreme Court has explained:

5

"To evaluate whether a defendant's Sixth Amendment right to speedy trial has been violated, Kansas applies the following four factors set out by the United States Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972): (1) length of delay, (2) reason for the delay, (3) defendant's assertion of his or her right, and (4) prejudice to the defendant. None of these four factors, standing alone, is sufficient for finding a violation. Instead, the court must consider them together along with any other relevant circumstances. [Citation omitted.] '"The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance."' [Citation omitted.]" *Rivera*, 277 Kan. at 113.

*Length of Delay*

"'The constitutional protection of a speedy trial attaches when one becomes accused and the criminal prosecution begins, usually by either an indictment, an information, or an arrest, whichever first occurs.'" *Rivera*, 277 Kan. at 112 (quoting *State v. Taylor*, 3 Kan. App. 2d 316, 321, 594 P.2d 262 [1979]). There is no set time that constitutes a presumptively prejudicial delay. Instead, to determine if the length of delay was presumptively prejudicial, courts should consider the complexity of a defendant's case. "The tolerable delay for an ordinary crime is less than for a complex one." *State v. Weaver*, 276 Kan. 504, 511, 78 P.3d 397 (2003).

Here, Owens' case was a simple one. The State's case largely relied on the eyewitness testimony of Davis and Officer Johnson. The State's other key evidence against Owens was physical evidence, such as Owens' cell phone, Owens' baseball cap, and the gun. Thus, the State's case against Owens was primarily dependent upon eyewitness testimony and physical evidence, neither of which require overly complicated trial preparation that should have caused a lengthy delay.

As a result, one would assume that the State should have been able to prosecute Owens' case relatively quickly. Although each length of delay analysis depends upon the

individual facts of that case, our Supreme Court has held that a delay of nearly 10 months was presumptively prejudicial in a simple and straightforward case. *Weaver*, 276 Kan. at 511. Accordingly, this court can conclude that a delay of 10 months or more in Owens' case would constitute a presumptively prejudicial delay.

Here, the police arrested Owens on February 16, 2012, the trial court dismissed Owens' juvenile information *and* the State filed Owens' adult information on August 30, 2012, and Owens' trial started on September 23, 2013. This means that 586 days, or nearly 19 months, passed between the date of Owens' arrest and the beginning of Owens' trial. Yet, only 390 days, or about 13 months, passed from the date Owens was charged as an adult and the date of his trial.

In their briefs, both Owens and the State note the two different periods of delay, but neither have included any arguments on which period constitutes the actual length of delay in this case. Clearly, given the preceding analysis, either the 19-month delay or the 13-month delay was presumptively prejudicial. Still, because a delay of 13 months is necessarily less prejudicial than a delay of 19 months, it is important to determine which period of delay constituted the actual length of delay in this case.

There seems to be no Kansas caselaw exactly on point. Yet, one case, *State v. Myers*, 116 Ariz. 453, 569 P.2d 1351 (1977), may provide this court with guidance. In *Myers*, the Arizona Supreme Court held that the defendant who was initially charged as a juvenile, but later charged as an adult, did not become the "accused" so as to start the running of the constitutional speedy trial clock until the State of Arizona charged the defendant as an adult, *i.e.*, the filing of the adult information. 116 Ariz. at 454-55. The *Myers* reasoning is sound because although Myers was arrested at a date earlier than the date he was charged as an adult, his first encounter with the adult court in which he was ultimately convicted happened upon the filing of the adult information.

7

As a result, for constitutional speedy trial purposes, we determine that Owens' case started when the State filed the information charging Owens as an adult on August 30, 2012. In turn, between this date and the start of Owens' trial on September 23, 2013, there was a 13-month delay. Given the simplicity of Owens' case, this 13-month delay was presumptively prejudicial.

### *Reason for the Delay*

In *Barker v. Wingo*, 407 U.S. 514, 531, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972), the United States Supreme Court explained the "reason for the delay" factor as follows:

> "A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay."

"Where the defendant's actions 'were the primary cause of the delay,' the second factor 'weighs heavily against him.'" *United States v. Larson*, 627 F.3d 1198, 1208 (10th Cir. 2010) (quoting *United States v. Toombs*, 574 F.3d 1262, 1274 [10th Cir. 2009]).

The parties' arguments concerning why there was a delay turn on the continuances Parker requested on Owens' behalf. A review of the record establishes that Parker requested and was granted 10 continuances while the State requested no continuances. The State argues that the continuances should count against Owens because his attorney requested the continuances. Owens, on the other hand, argues that the continuances cannot be counted against him because Parker failed to obtain his consent and to ensure his presence at the continuance hearings. In fact, not only does Owens argue that the continuances cannot be counted against him, he also argues that because the continuances were granted "without his consent or presence," the State committed "negligent delay

8

[by] fail[ing] to adequately protect [his] speedy trial rights by assuring his presence and consent."

First, although attorneys have a duty to keep their clients informed about their cases and clients have a statutory right under K.S.A. 2016 Supp. 22-3405(a) to be present at continuance hearings so they can voice any objections to the continuances, attorneys do not have a duty to acquire their clients' consent to obtain a continuance because scheduling matters are strategic and tactical decisions. See *Rivera*, 277 Kan. at 116-17; and *Sola-Morales v. State*, 300 Kan. 875, 897-98, 335 P.3d 1162 (2014). Second, if defendants can successfully establish that they were absent from a critical stage of their defense, defendants have also established that their rights under the Sixth Amendment's Confrontation Clause and Fourteenth Amendment's Due Process Clause were infringed. See *State v. Brownlee*, 302 Kan. 491, 507, 354 P.3d 525 (2015). Third, it seems doubtful that Owens was present at the continuance hearings, given that the appearance docket states that for each continuance hearing there was a hearing but no record taken. Nevertheless, no other evidence supports Owens' presence. As a result, this court cannot definitively conclude that he was absent from those hearings.

Nevertheless, even assuming Owens was not present at the continuance hearings, Owens' contention that the delay resulted from the State's negligence does not automatically succeed. To begin with, it is unclear how the State would have committed negligence by failing to ensure Owens' presence at the continuance hearings, and outside of making this bald assertion, Owens has provided no additional authority or argument on appeal. It is a well-known rule of this court that failing to support an argument with pertinent authority or explaining why an argument is sound, despite a lack of pertinent authority, is akin to failing to adequately brief an issue. *State v. Murray*, 302 Kan. 478, 486, 353 P.3d 1158 (2015). Further, although Owens cites *Brownlee*, a case which addressed whether continuance hearings constituted a critical stage of a defendant's defense, Owens has not actually asserted that the continuance hearings constituted critical stages of his defense. Indeed, he has not even asserted that his appearance was required at

9

the continuance hearings because he intended to voice objections to the continuances. Instead, he merely complains that he was not present at the continuance hearings.

In *State v. Shaffer*, No. 114,174, 2016 WL 4414614, at *4 (Kan. App. 2016) (unpublished opinion), Shaffer argued that the continuances his attorney had been granted should not count against him for constitutional speedy trial purposes because he was not present at the continuance hearings. The *Shaffer* court held that Shaffer's complaints about not being present at the continuance hearings were inadequately briefed for consideration because Shaffer did not allege that the hearings constituted a critical stage of his defense. Based upon this failure, the *Shaffer* court deemed Shaffer's arguments waived and abandoned. 2016 WL 4414614, at *4.

Here, by not arguing or explaining why the continuance hearings constituted a critical stage of his defense, Owens has not alleged that his constitutional rights under either the Sixth Amendment's Confrontation Clause or the Fourteenth Amendment's Due Process Clause were violated. In turn, he has failed to adequately explain why his apparent absence from the continuance hearings affects this court's analysis in determining whether his constitutional speedy trial right was violated. It therefore follows that he also cannot establish that the State committed some negligent act that contributed to the delay by failing to ensure his presence at the continuance hearings.

Moreover, the State's arguments that Owens' actions were the primary reason for the delay are persuasive. For starters, as emphasized by the State, the record establishes that during most of the time this case—12 CR 2136—was pending, Parker was also representing Owens in another case—12 CR 2137. Indeed, Owens' 12 CR 1237 case for aggravated battery and battery was pending from February 27, 2012, until he was convicted following a jury trial on July 30, 2013. Because this case started upon the filing of Owens' adult information on August 30, 2012, and concluded upon the start of Owens' trial on September 23, 2013, Owens' other criminal case was pending 11 out of the 13 months this case was pending.

10

Clearly, the fact Owens had another criminal case pending at the same time as this case contributed to the reason for delay. Because there were two cases pending, Parker's time was necessarily split between Owens' two cases. Stated another way, Parker had twice the amount of work for the same client. This also means that although there was a 13-month delay between when Owens was charged and when Owens' trial occurred, during that 13-month period, Owens had Parker take two cases to jury trial. This is a fact we cannot ignore in considering why Owens' trial was delayed.

Next, Owens' trial was also delayed because he was attempting to negotiate a favorable plea agreement with the State during most of the time his case was pending. At the hearing on Owens' motion for new counsel and motion to dismiss, Parker discussed how Owens had asked her to enter into plea negotiations with the State with the goal of consolidating his 12 CR 2136 and 12 CR 2137 cases. At the hearing on Owens' motion to dismiss, Parker explicitly stated that because of the ongoing plea negotiations, she had to request several continuances. The prosecutor confirmed Parker's statements about plea negotiations. Owens, who was present at both hearings, never alleged that Parker was misinforming the court about his desire to reach a plea agreement with the State. Most importantly, in his pro se motion to dismiss, Owens confirmed Parker's statements by stating (1) that he had asked Parker to enter into plea negotiations with the State and (2) that on July 16, 2013, he had been presented with a plea agreement in which his 12 CR 2136 and 12 CR 2137 cases were consolidated.

Given the preceding, it is clear that Owens did not want to go to trial until after he rejected the State's proposed plea agreement on July 16, 2013. In other words, because Owens did not want to have a trial until after he rejected the plea agreement, which was just 2 months before the start of his trial in this case, it is readily apparent that Owens' actions significantly contributed to 11 of the 13 months of delay. Additionally, by admitting that he was seeking a plea agreement up until July 16, 2013, Owens has implicitly conceded that he not only acquiesced to the continuances but also wanted the

11

continuances. As a result, Owens' decision to seek a plea agreement with the State contributed to the delay of his trial.

*Assertion of Rights*

Both parties agree that Owens first complained about the continuances and intimated that his constitutional speedy trial right had been violated in his pro se motion for new counsel, which was filed on May 30, 2013. Owens again complained about the continuances and explicitly complained about a constitutional speedy trial right violation in his posttrial pro se motion to dismiss his case. As a result, the "assertion of rights" factor weighs in Owens' favor, tending to support that his constitutional speedy trial right was violated.

*Prejudice*

In discussing the prejudice factor, the *Barker* court explained that the speedy prosecution of a defendant's case helps prevent the following prejudicial effects: (1) the "oppressive pretrial incarceration," (2) the "anxiety and concern of the accused," and (3) "the possibility that the defense will be impaired." 407 U.S. at 532. In his brief, Owens argues that the 13-month delay prejudiced him in all three of these ways.

Owens first asserts that his "lengthy pretrial incarceration" was oppressive as it increased his time in custody. He then asserts that he suffered anxiety, suspicion, and hostility because of his lengthy pretrial incarceration, citing to the existence of his pro se motions as support for this argument. Yet, as Owens acknowledges, he was not in custody solely for this case while awaiting trial. As pointed out by the State in its brief, because Owens was in custody for another case, any time Owens spent in custody or anxiety, suspicion, and hostility was not solely caused by this case. In fact, because Owens was in custody on other criminal charges 11 of the 13 months he was in custody

12

in this case, Owens would have felt these adverse effects regardless of any delay that occurred in this case.

Owens' next argument focuses on whether his defense was prejudiced because of the delay. Owens' entire argument hinges on his belief that Davis' testimony was affected by a fading memory. In support of this belief, Owens points out that Davis had to have his recollection refreshed while testifying at his trial. Owens also insinuates that Davis' testimony about his eyewitness identification was inconsistent. The State responds that "to the extent that [Davis] could not remember certain details regarding his statement to police or his identification of [Owens], this would benefit, rather than prejudice, [Owens]."

The State's response is valid. Considering Davis had always asserted that Owens was the man who pointed a gun at him and took his keys, any difficulties Davis had in remembering exactly what happened and what he saw would have actually benefited Owens. That is, assuming Davis' memory had faded, Owens would have been able to take advantage of Davis' fading memory, using it to support his argument that Davis misidentified him as the man who robbed him at gunpoint. Yet, the evidence does not support that Davis' memory was fading or that Davis provided inconsistent statements about his eyewitness identification. From Davis' initial 911 phone call to his testimony at trial, Davis consistently stated that the man who robbed him at gunpoint was a young black male about 6 feet tall, stocky, and wearing a black hooded sweatshirt, a baseball cap, and blue jeans. The fact that Davis had to have his recollection refreshed one time does not change this fact. In short, because Davis' description of the man who robbed him at gunpoint was consistent, there is no evidence Owens' defense was prejudiced by the delay.

*Conclusion*

When considering all of the *Barker* factors together, the fact that Owens' actions were the primary cause for the delay and the lack of prejudice outweigh the other factors. Consequently, Owens' constitutional speedy trial right was not violated.

*Was the Victim's Eyewitness Identification Unnecessarily Suggestive?*

Whether an eyewitness identification was unnecessarily suggestive is a mixed question of law and fact. *State v. Calderon-Aparicio*, 44 Kan. App. 2d 830, 841, 242 P.3d 1197 (2010), *rev. denied* 291 Kan. 914 (2011). Appellate courts review the factual findings of the trial court for substantial competent evidence and the legal conclusions of the trial court de novo. 44 Kan. App. 2d at 841. Nevertheless, for an eyewitness identification challenge to be properly before an appellate court, defendants must have first challenged the identification before the trial court. 44 Kan. App. 2d at 841.

For the first time on appeal, Owens asserts that Davis' show-up eyewitness identification was unnecessarily suggestive, meaning there is a substantial likelihood that Davis misidentified him and his due process rights were violated. Based upon this belief, Owens argues that Davis' eyewitness identification should have been suppressed and he is entitled to a new trial. Citing *Calderon-Aparicio*, however, the State responds that Owens' failure to challenge Davis' eyewitness identification below prevents Owens from challenging the identification for the first time on appeal.

In *Calderon-Aparicio*, Calderon-Aparicio challenged a show-up witness identification for the first time on appeal. This court declined to consider Calderon-Aparicio's argument, holding that because eyewitness identification challenges are evidentiary challenges, a contemporaneous objection as stated under K.S.A. 60-404 is required to preserve the argument for appeal. 44 Kan. App. 2d at 841. In reaching this holding, the *Calderon-Aparicio* court recognized that there are three exceptions to the

14

general rule that issues raised for the first time on appeal are not properly before the court—when the issue involves a question of law arising on proved or admitted facts that is finally determinative of the case, when consideration of the issue is necessary to serve the ends of justice, and when the trial court's ruling may be upheld despite reliance on the wrong ground for its decision. 44 Kan. App. 2d at 841-42. The *Calderon-Aparicio* court also recognized that in *State v. Hunt*, 275 Kan. 811, 813, 69 P.3d 571 (2003), our Supreme Court applied the necessary to serve the ends of justice exception to address an eyewitness identification challenge for the first time on appeal. 44 Kan. App. 2d at 842.

Nevertheless, the *Calderon-Aparicio* court declined to consider Calderon-Aparicio's eyewitness identification challenge for the first time on appeal, explaining:

"[I]n more recent years, our Supreme Court in *State v. King*, 288 Kan. 333, 348-49, 204 P.3d 585 (2009), held that evidentiary claims must be preserved by a contemporaneous objection at trial in order for those claims to be reviewed on appeal:

'[T]he legislature's intent in enacting K.S.A. 60-404 is clear:  a party must lodge a timely and specific objection to the admission or exclusion of evidence in order to preserve the evidentiary question for review.

'We stress today the importance of this legislative mandate. K.S.A. 60-404 dictates that evidentiary errors shall not be reviewed on appeal unless a party has lodged a timely and specific objection to the alleged error at trial. Although our past decisions may have relaxed the objection requirement in the evidentiary context, this practice not only has led to confusion as to the standards that should be applied on appeal, but also has de-emphasized the role of counsel at trial and has impaired the gate-keeping function of district courts in this state. [Citation omitted.] More importantly, this practice of reviewing evidentiary questions when no objection has been lodged runs contrary to the legislature's clearly stated intent in K.S.A. 60-404.

'. . . From today forward, in accordance with the plain language of K.S.A. 60-404, evidentiary claims-including questions posed by a prosecutor and responses to those questions during trial—must be preserved by way of a contemporaneous objection for those claims to be reviewed on appeal.'

15

"Since *King*, our Supreme Court has consistently 'been refusing to review an evidentiary issue without a timely and specific objection even if the issue involves a fundamental right.' *State v. Dukes*, 290 Kan. at 488; see *State v. Richmond*, 289 Kan. 419, 429-30, 212 P.3d 165 (2009) (where our Supreme Court expressed concern that the contemporaneous objection rule 'case-law exceptions would soon swallow the general statutory rule'); [*State v.*] *Hollingsworth*, 289 Kan. [1250,] 1256-57[,221 P.3d 1122 (2009)].

"Based on our Supreme Court's recent holdings in *King* and *Dukes*, we determine that Calderon-Aparicio, by failing to object to introduction of the eyewitness identification into evidence at trial, has failed to preserve this issue for appeal." 44 Kan. App. 2d at 842-43.

In his brief, Owens recognizes that *Calderon-Aparicio* is factually identical to his case. All the same, Owens asserts that his case is distinguishable from Calderon-Aparicio for the following reasons: (1) "because [his challenge involves] a form of due process error similar to reviewing for sufficiency of the evidence"; and (2) "because of the recent recognition regarding the harms of unnecessarily suggestive identification compels review."

Concerning his argument regarding due process, we note that Owens asserts that his argument "is not merely an evidentiary issue—it involves review of the evidence used for conviction under the Due Process Clause, more similar to a sufficiency claim than a purely evidentiary claim." He contends that this makes his argument different than the argument raised by Calderon-Aparicio. Yet, Calderon-Aparicio also asserted that this court should review his argument for the first time on appeal because his due process rights had been violated by an unnecessarily suggestive eyewitness identification. Indeed, Owens' due process argument essentially mirrors this court's explanation of Calderon-Aparicio's argument: "Calderon-Aparicio argues that because the instant issue is *not merely an evidentiary issue* but also involves his due process rights, this court should

16

apply the exceptions to address his argument." (Emphasis added.) 44 Kan. App. 2d at 842. Thus, this argument is unpersuasive.

Turning to his argument regarding "recent societal and legal recognition of an increased risk of incorrect identification based upon unnecessarily suggestive identification techniques," we note Owens asserts that K.S.A. 2016 Supp. 22-4619 and *State v. Carr*, 300 Kan. 1, 226, 331 P.3d 544 (2014), *rev'd and remanded* 577 U.S. ___, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016), as well as cases from other jurisdictions, support his proposition. K.S.A. 2016 Supp. 22-4619, a law enacted in 2016, requires law enforcement agencies to have a detailed written policy on eyewitness identifications. In the *Carr* case, our Supreme Court held that it is an abuse of discretion for the trial court to automatically exclude expert testimony on eyewitness identifications. 300 Kan. at 226. Moreover, the cases from the other jurisdictions, which Owens cites, involve jury instructions on eyewitness identification. See, *e.g.*, *Commonwealth v. Gomes*, 470 Mass. 352, 358-59, 22 N.E.3d 897 (2015), *holding modified by Commonwealth v. Bastaldo*, 472 Mass. 16, 32 N.E.3d 873 (2015). Although not clearly stated, it seems that Owens believes that because some law supports that increased measures must be taken to ensure accurate eyewitness identifications, he can raise his eyewitness identification challenge for the first time on appeal.

Yet, the law supporting increased measures to ensure accurate eyewitness identifications is wholly unrelated to the issue currently before this court, which is whether Owens' eyewitness identification argument can be raised for the first time on appeal. Owens ignores that the law he cites comes into play only if defendants have timely raised their eyewitness identification arguments. Moreover, the law he cites in no way suggests that eyewitness identification issues are exempt from the contemporaneous objection rule. Thus, this argument is also unpersuasive.

Finally, Owens' argument neglects to consider that since the *Calderon-Aparicio* decision, our Supreme Court has consistently reaffirmed K.S.A. 60-404's

contemporaneous objection rule for challenges involving the erroneous admission of evidence. See, *e.g.*, *State v. Beltz*, 305 Kan. 773, 776, 388 P.3d 93 (2017); *State v. Solis*, 305 Kan. 55, 62, 378 P.3d 532 (2016); *State v. Dupree*, 304 Kan. 43, 62, 371 P.3d 862, *cert. denied* 137 S. Ct. 310 (2016). Indeed, in the very recent decision, *State v. Love*, 305 Kan. 716, 729, 387 P.3d 820 (2017), our Supreme Court cited the *King* case's holding that "'[f]rom today forward, in accordance with the plain language of K.S.A. 60-404, evidentiary claims—including questions posed by a prosecutor and responses to those questions during trial—must be preserved by way of a contemporaneous objection for those claims to be reviewed on appeal'" with approval. Based on our Supreme Court precedent, as well as the rationale outlined in *Calderon-Aparicio*, we decline to consider Owens' argument for the first time on appeal.

*Was There Prosecutorial Error During Closing Arguments?*

In *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016), our Supreme Court outlined the standard for reviewing prosecutorial error as follows:

> "Appellate courts will continue to employ a two-step process to evaluate claims of prosecutorial error. These two steps can and should be simply described as error and prejudice. To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman*. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.] We continue to acknowledge that the statutory harmlessness test also applies to prosecutorial error, but when 'analyzing both

constitutional and nonconstitutional error, an appellate court need only address the higher standard of constitutional error.' [Citation omitted.]"

Owens takes issue with two statements made by the prosecutor during closing arguments. Owens argues that both statements commented on facts not in evidence. The first statement by the prosecutor that Owens challenges concerns the prosecutor's discussion about what Davis and Officer Johnson noticed about Owens when seeing him following his arrest. The specific statements Owens complains about occurred within the following exchange between the prosecutor, Parker, and the trial court:

> "[PROSECUTOR]: And what's the first thing that both the officer and Nathan Davis say when they see him after he's under arrest? Well, he's the same; oh, except he's not wearing his blue jeans anymore now, he's wearing these crazy pants.
> "MS. PARKER: Objection. That's not in evidence.
> "[PROSECUTOR]: It's the first thing—
> "THE COURT: The phrasing is sustained. Go ahead.
> "[PROSECUTOR]: It's the first thing that both of them notice when Nathan Davis is taken from his apartment to go get his car and his keys—which he testified he got back that night—Hey, this guy is not wearing the same pants. Of course, it's the first things he notices because it's obvious. Think about the amount of body that a pair of jeans takes up."

Owens argues that the preceding statements were misstatements of fact because neither Davis nor Officer Johnson testified about "saying," *i.e.*, verbally communicating to someone, that they noticed Owens was not wearing blue jeans but pajama pants. Owens also points out that even if Davis and Johnson did say something, their testimony does not support that it was not the "first thing" they said when they saw Owens following his arrest.

The second statement that Owens challenges is as follows:

19

"And, oh, remember what the detective told you: I tried to get into his phone but I couldn't because it was password-protected. I had to take out the SD card and run that to get onto the phone. So how does the person who supposedly stole his phone call his friend, JR, and set up this meeting.

"There's no way somebody could have accessed that phone. You've got a detective that can't even access the phone. He's got a search warrant and all the resources of the [Wichita Police Department (WPD)], he can't get in through the phone and the pass code."

Owens asserts that the comment that there was "no way" that someone could have called JR's phone from his allegedly stolen cell phone based on the password protection went beyond the evidence. Owens argues that there was not enough information in evidence to establish whether the person who stole his cell phone could have placed the password protection on his phone or unlocked the password protection. Owens additionally asserts that the comment about the WPD not being able to unlock the phone's password protection despite its resources constituted a fact not in evidence because the police officer who took the SD card out of Owen's cell phone did not testify about WPD resources.

The State responds to both of Owens' prosecutorial error claims by asserting that Owens is nitpicking the prosecutor's statements, taking the prosecutor's statements out of context. Nevertheless, the State concedes that Owens is technically correct about the following: (1) there was no evidence that either Davis or Owens immediately told another person that Owens had changed pants; (2) there was no evidence concerning the WPD's resources to unlock the password protection on Owens' cell phone; and (3) there was no evidence about what steps, if any, the police officer took to unlock the password protection on Owens' cell phone.

Owens argues that he suffered prejudice because the prosecutor's statements commented on the credibility of the eyewitness identifications and himself. Concerning Davis' eyewitness identification, Owens asserts that because the parking lot was poorly lit

20

and Davis saw him for only 30 or 40 seconds, the accuracy of Davis' identification was in question. He argues that the prosecutor's statement about the police officer not being able to unlock Owen's cell phone's password protection "functionally told the jury that [his] testimony could not have happened."

Yet, as noted by the State, regardless of whether Davis and Officer Johnson immediately verbally communicated to someone that they noticed Owens had changed from wearing blue jeans to pajama pants, both testified that upon seeing Owens following his arrest, they noticed that Owens was now wearing pajama pants. Davis testified that when he identified Owens at the show-up, Owens "was now wearing what looked like pajama pants with a design on them, instead of jeans." Officer Johnson testified that when he saw Owens following his arrest, Owens was wearing "almost the same clothing that [he] had chased him in . . . but he ha[d] changed his pants by [that] point" as he "basically just ha[d] pajama pants on." Because this testimony was in evidence, any prejudicial effect from the prosecutor's misstatement was very minimal.

Next, regardless of whether there was "no way" a person could have unlocked Owens' cell phone's password protection, the police officer's testimony about the password protection supported that a person would either have to know Owens' password to access it or some sort of additional technology to unlock the password protection. Further, despite Owens' argument to the contrary, the prosecutor did not tell the jury that Owens was lying. Instead, the prosecutor's statement was a comment on the likelihood that Owens' version of events was plausible. As a result, any prejudicial effect from the prosecutor's statement was minimal.

Last and most importantly, the evidence against Owens was overwhelming. Despite the poor lighting and limited time to view his assailant, Davis' description of the man who robbed him of his keys at gunpoint has always been consistent. Officer Johnson's description of the man he saw run from Davis' car has also been consistent. Of significance, it is undisputed that Owens had on both blue jeans and pajama pants at some

21

point the day Davis was robbed at gunpoint. Moreover, the following evidence supported Owens' guilt: (1) that Owens admittedly ran from the police and was found in the vicinity of Davis' stolen car; (2) that Owens admittedly hid in a stranger's backyard; (3) that Owens' cell phone was found in Davis' stolen car; and (4) that the gun used to rob Davis was found in a yard nearby the yard where Owens was hiding in.

In conclusion, when considering the preceding evidence in conjunction with the fact that any error resulting from the prosecutor's statements was minimal, it is readily apparent that even if the prosecutor's statements were error, there is no reasonable possibility that the prosecutor's errors resulted in harm. Consequently, we reject Owens' arguments on this issue.

*Was There Cumulative Error?*

When reviewing a cumulative error challenge, this court considers whether the defendant had a fair trial when considering all the errors together. *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 (2014). Cumulative error cannot exist if the defendant has established no errors or just one error. *State v. Williams*, 299 Kan. 509, 566, 324 P.3d 1078 (2014).

Owens asserts that even if the speedy trial, eyewitness identification, and prosecutorial errors do not individually require reversal, reversal is required when those errors are considered together under the doctrine of cumulative error. Nevertheless, as explained in depth already, Owens has failed to establish more than one error. Accordingly, there cannot be cumulative error.

*Was There an* Apprendi *Violation?*

Owens' last argument is that the trial court's finding that he committed his crimes with a deadly weapon, which supported KORA registration as a violent offender under

K.S.A. 2011 Supp. 22-4902(e)(2), violated his Sixth Amendment right to a jury as stated in *Apprendi*. In *Apprendi*, the United States Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. Thus, Owens believes the jury should have decided whether he committed his crimes with a deadly weapon so as to require KORA registration. The State responds that this court decline to consider this argument because Owens is raising it for the first time on appeal. Owens admits that he is raising this argument for the first time on appeal, but he cites cases where this court has considered challenges under *Apprendi* for the first time on appeal because such challenges involved whether a defendant's fundamental right had been violated.

In this respect, Owens is correct. Traditionally, this court has considered *Apprendi* challenges for the first time on appeal because they involve whether a defendant's fundamental right had been violated. See, *e.g.*, *State v. Unrein*, 47 Kan. App. 2d 366, 369, 274 P.3d 691 (2012), *rev. denied* 297 Kan. 1256 (2013). As a result, we will consider Owens' argument even though he is raising it for the first time on appeal.

When reviewing questions concerning the constitutionality of a statute, this court exercises unlimited review. *State v. Mossman*, 294 Kan. 901, 906, 281 P.3d 153 (2012).

The entirety of Owens' argument why the trial court's KORA registration ruling was unconstitutional turns on our Supreme Court's decision in *State v. Charles*, 304 Kan. 158, 178, 372 P.3d 1109 (2016). In *Charles*, our Supreme Court held that offender registration constitutes a form of punishment because it essentially increases the penalty for a crime. 304 Kan. at 178. Thus, the *Charles* holding supports that Owens' *Apprendi* argument has merit.

Nevertheless, this court is not bound to follow our Supreme Court's precedent if our Supreme Court has indicated that it is departing from its previous position. *State v.*

23

*Meyer*, 51 Kan. App. 2d 1066, 1072, 360 P.3d 467 (2015). As explained in *State v. Johnson*, No. 115,919, 2017 WL 1369957, at *6 (Kan. App. 2017) (unpublished opinion), our Supreme Court has indicated it is departing from its holding in *Charles*:

> "The ruling in *Charles* was based on a case published on the same day, *Doe v. Thompson*, 304 Kan. 291, 373 P.3d 570 (2016), *overruled by State v. Petersen-Beard*, 304 Kan. 192, 377 P.3d 1127 (2016). *Thompson*, a four-to-three decision, held that the registration requirement was a type of punishment; therefore, the Ex Post Facto Clause of the United States Constitution applied to prevent retroactive application of amendments to the registration statutes. 304 Kan. 291, Syl. ¶ 7. But *Thompson* was overruled on the day it was issued: *Petersen-Beard*, with a different four-judge majority, held that the registration requirement couldn't be challenged as cruel and unusual punishment under either the United States or the Kansas Constitutions because it was not a type of punishment. 304 Kan. 192, Syl. ¶¶ 1-2. *Petersen-Beard* didn't expressly overrule *Charles*, but it did expressly overrule *Thompson*. And in *Charles*, the court noted that the *Petersen-Beard* holding—which is the exact opposite of the *Thompson* holding that *Charles* relied on—'may influence whether the [registration-requirement] holding of this case is available to be relied upon by violent offenders whose appeals have yet to be decided.' 304 Kan. at 179.
>
> "So while *Charles* is exactly on point and hasn't been expressly overruled, we have an indication, both from the *Charles* court and from the differently constituted *Petersen-Beard* court, that the Supreme Court is departing from the position that imposing a registration requirement based on a court finding that the defendant used a deadly weapon violates *Apprendi*. [Citations omitted.] We note too that the *Petersen-Beard* decision was issued by the full, regular members of the Kansas Supreme Court, while the *Charles* and [*Thompson*] courts included one judge who was not a member of the court, sitting by designation for those cases.
>
> "We conclude that *Charles* is no longer good law. Thus, the district court did not violate *Apprendi* when it found that Johnson used a deadly weapon in the course of committing a person felony and relied on that finding to require Johnson to register as a violent offender."

As in *Johnson*, we conclude that *Charles* is no longer good law. See *State v. Secrest*, No. 115,565, 2017 WL 543546, at *4-5 (Kan. App. 2017) (unpublished opinion),

24

*petition for rev. filed* March 9, 2017 (where another panel of this court held that *Charles* was no longer good law based upon *Petersen-Beard*). Because the *Petersen-Beard* court held that KORA registration is not a type of punishment, Owens' rights under *Apprendi* were not implicated. *State v. Petersen-Beard*, 304 Kan. 192, Syl. ¶¶ 1-2, 377 P.3d 1127 (2016).

Affirmed.