NOT DESIGNATED FOR PUBLICATION

No. 120,166

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

THOMAS EUGENE BARLOW,
*Appellant*.

MEMORANDUM OPINION

Appeal from Geary District Court; MARITZA SEGARRA, judge. Opinion filed February 7, 2020. Affirmed.

*Hope E. Faflick Reynolds*, of Kansas Appellate Defender Office, for appellant.

*Jason B. Oxford*, assistant county attorney, *Krista Blaisdell*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before LEBEN, P.J., GARDNER, J., and MCANANY, S.J.

PER CURIAM: After a jury convicted Thomas E. Barlow of aggravated criminal sodomy and indecent liberties with a child, the district court sentenced him to 104 months in prison. Barlow raises five issues in this direct appeal. He argues the district court erred (1) by denying his motion to suppress his confession, (2) by admitting evidence of prior sexual misconduct, (3) by denying the admission of evidence concerning Kansas' rape shield law, and (4) by improperly instructing the jury. He also argues that K.S.A. 2018 Supp. 60-455(d) violates his due process rights under the Kansas and the United States Constitutions. Finding no error, we affirm.

1

*Factual and Procedural Background*

Thomas Barlow and his ex-wife have five children together. H.B. is their oldest daughter. In October 2016, when H.B. was 15 years old, H.B. told Mother that she no longer wanted to live at home because Barlow had been molesting her. Mother dropped H.B. off then went to the police station where she met with Officer Kyle Hagen. Once he interviewed Mother, Hagen asked to speak with H.B.

H.B. told Hagan that Barlow began to touch her sexually when she was between 9 and 12 years old. At first, these encounters involved kissing, groping, and touching of the areas around her breasts, thighs, and genitals. Later, these encounters progressed to oral sex, digital penetration of H.B.'s vagina, and, once, penile penetration of H.B.'s vagina. These encounters started when the family lived in Wichita and continued when they moved to Geary County. The molestation usually occurred in the living room, in her parents' bedroom, or in the family's shared bathroom. It happened multiple times a week, normally when Mother was away at work. It stopped when, one week before H.B. revealed this molestation, she told her father that she did not want him to touch her anymore. In response, he threatened to withhold her Wi-Fi access or to increase her chores.

After this interview, Hagen and Mother went to pick up the other children at the family home to place them in protective custody. Barlow was there so Hagen asked if he would go to the police station for an interview. Because Barlow complied, Hagen did not arrest him or put him in handcuffs.

Hagen interviewed Barlow at the police station around 11 p.m. Hagen read Barlow his *Miranda* rights, which Barlow waived. Hagen informed Barlow that someone had told police that he had inappropriately touched H.B. Barlow denied the allegations and said he had not touched her "other than normal affection, hugging, kissing on [the] forehead."

2

Then Hagen told Barlow that H.B. had made the allegations. Barlow continued to deny he had done anything wrong. Hagen asked more specific questions about Barlow's physical contact with H.B., yet Barlow still denied that he had ever purposefully touched H.B. inappropriately. Hagen then asked if Barlow could think of any reasons why H.B. would make up these allegations. Barlow could not.

Hagen explained that the police take allegations of sexual misconduct seriously. If H.B. had falsely accused Barlow, she could face a charge for giving a false statement and that could lead to incarceration in jail, prison, or a juvenile detention facility. And it could also complicate her admission into college. Hagen repeatedly asked Barlow to tell the truth. Hagen told Barlow this was best for everyone and, if the allegations were true, the police would find out eventually. Still, Barlow had nothing to add, so Hagen ended the interview and took Barlow back to his house.

About two-and-one-half hours later, Barlow called the police department, requesting that Hagen pick him up. Barlow told the dispatcher that he had been praying and God told him he should confess. After Hagen picked Barlow up and returned to the police station, Hagen reissued the *Miranda* warning and Barlow again waived it. Barlow began by asking if his family could live their lives normally, even if he was not there. Hagen stated that would depend on what he told him.

Barlow told Hagen that he had had 30 to 40 sexual encounters with H.B. These encounters started out as tickling but progressed to sexual touching. He estimated the encounters began around the time H.B. was 13 years old and continued until a week before the interview. Barlow denied any penile penetration but admitted to digital penetration. Sometimes, Barlow would perform oral sex on H.B. as well. H.B. had touched his testicles, but he did not recall her touching his penis. These encounters happened in his bedroom and in the shared bathroom, while his wife was at work. Barlow stated that he never forced himself upon H.B. Instead, he insisted that she would give him

3

affirmative signals to engage in the touching. He also told Hagen that he had been good at denying these encounters in the past, but Hagen's words about telling the truth stuck with him. After Barlow provided a signed, written confession, Hagen arrested him.

Before trial, Barlow moved to suppress his confession. The district court denied that motion. Barlow also moved to introduce evidence pursuant to K.S.A. 2018 Supp. 21-5502. The district court denied that motion as well. The State, however, moved to admit evidence pursuant to K.S.A. 2018 Supp. 60-455(d), and the district court granted that motion.

At trial, H.B., Mother, and Hagen testified for the State. The jury viewed the audio and video recordings of Barlow's confession as well as his written statement. Hagen testified that Barlow's confession generally corroborated H.B.'s allegations. But he noted these discrepancies between the two accounts:

- the number of occurrences,
- any penile penetration of H.B.'s vagina,
- any oral sex performed on Barlow, and
- who initiated the sexual encounters.

Barlow called witnesses to establish foundation for pictures of Barlow's home, and text messages between H.B. and her boyfriend. And Barlow testified that at the time of H.B.'s allegations he had a hydrocele which caused one of his testicles to be greatly enlarged.

The jury found Barlow guilty of one count of criminal sodomy and two counts of aggravated indecent liberties with a child, but it acquitted Barlow of two counts of aggravated indecent liberties and four counts of criminal sodomy. The district court

4

sentenced Barlow to 104 months in prison, lifetime postrelease supervision, and sex offender registration.

Barlow appeals.

*Did the District Court Err by Denying Barlow's Motion to Suppress His Confession?*

Barlow first argues that Hagen's statements during his interrogation overbore his will, rendering his confession involuntary. Barlow points to Hagen stating that H.B. could face prison time or the juvenile detention center if she made false allegations, and to Hagen imploring Barlow to tell the truth. Barlow raised those claims in his motion to suppress evidence of his confession, but the district court denied it.

*Standard of Review*

Our standard of review for a district court's decision on a motion to suppress has two components. We review the district court's factual findings to determine whether they are supported by substantial competent evidence. In reviewing the factual findings, the appellate court does not reweigh the evidence or assess the credibility of witnesses. *State v. Gibson*, 299 Kan. 207, 215-16, 322 P.3d 389 (2014). But we review the ultimate legal conclusion using a de novo standard. When, as here, the material facts supporting a district court's decision on a motion to suppress evidence are not in dispute, the ultimate question of whether to suppress is a question of law over which we have unlimited review. *State v. Hanke*, 307 Kan. 823, 827, 415 P.3d 966 (2018).

*The Governing Law*

The Fifth Amendment to the United States Constitution protects individuals' right against self-incrimination. This protection is incorporated to the states through the

5

Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 6-11, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964). Our Legislature has codified this right in K.S.A. 2018 Supp. 60-460(f). See *State v. Guein*, 309 Kan. 1245, 1261-62, 444 P.3d 340 (2019). In effect, coerced confessions should be inadmissible in a criminal trial. A confession is coerced when a defendant's "will has been overborne and his capacity for self-determination critically impaired." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26, 93 S. Ct. 2041, 2047, 36 L. Ed. 2d 854 (1973). In essence, the touchstone consideration is voluntariness. *State v. Palacio*, 309 Kan. 1075, 1087, 442 P.3d 466 (2019).

When a defendant claims police coerced him or her into making incriminating statements, the State bears the burden to prove, by a preponderance of the evidence, that the defendant made the statements voluntarily. *State v. Garcia*, 297 Kan. 182, 188, 301 P.3d 658 (2013). Courts employ a case-by-case evaluation to determine (1) whether impermissible coercion was present and (2) whether that coercion overbore the defendant's free and independent will. *Guein*, 309 Kan. at 1260. This coercion can be mental or physical. *State v. Stone*, 291 Kan. 13, 21, 237 P.3d 1229 (2010). Courts make this determination by considering the totality of the circumstances, aided by the following nonexclusive factors:

> "'"(1) the accused's mental condition; (2) the manner and duration of the interrogation; (3) the ability of the accused to communicate on request with the outside world; (4) the accused's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the accused's fluency with the English language." [Citation omitted.]'" *Stone*, 291 Kan. at 21.

*Unfairness Due to Threats*

Barlow focuses on the fifth factor, alleging that Hagen threatened or coerced him and thus overcame Barlow's will. He relies on three cases.

6

Barlow argues that the first case establishes that a confession is involuntary when an officer makes threats "regarding a suspect's children," citing *Lynumn v. Illinois*, 372 U.S. 528, 534, 83 S. Ct. 917, 9 L. Ed. 2d 922 (1963). In *Lynumn*, police had threatened to withhold welfare benefits for the defendant's infant children and to take her children away, under other coercive circumstances. The Court found that "a confession made under such circumstances must be deemed not voluntary, but coerced." 372 U.S. at 534.

Barlow supplements *Lynumn* with a second case—*State v. Brown*, 37 Kan. App. 2d 726, 732-33, 157 P.3d 655 (2007). There, the Kansas Department of Social and Rehabilitative Services did not recommend Brown's reintegration with his children, and it persistently pressured Brown and his wife to admit how one of his children had been injured. On the date set for relinquishment, Brown went to the sheriff's office and confessed to causing the injuries, despite having previously denied it. The district court found Brown may have been predisposed to falsely admit his guilt just to get his children back. This court found "it was entirely appropriate for the district court to consider the pressure placed on Brown by the CINC proceedings in considering the totality of the circumstances surrounding his confession." 37 Kan. App. 2d at 732.

Barlow cites a third case to show that threats to bring additional charges against a defendant are coercive—*State v. Swanigan*, 279 Kan. 18, 106 P.3d 39 (2005). In *Swanigan*, the police told Swanigan that if he did not confess to the crimes charged, they would recommend that the county attorney charge Swanigan with additional crimes. The court weighed this as one of the factors that could render a confession involuntary. 279 Kan. at 34-37.

Combining these three cases, Barlow concludes that Officer Hagen coerced him into confessing "by linking responses to interrogation questions with H.B.'s future freedom and opportunities." In other words, Barlow argues that if a threat involving a defendant's children is coercive (*Lynumn* and *Brown*) and if a threat to bring charges

7

against a defendant is coercive (*Swanigan*), then a threat to bring charges against a defendant's child is coercive.

### *Lynumn and Brown*

We disagree. *Lynumn* and *Brown* are not "of the same nature" as this case. Those cases examined how the State's interference with a defendant's parental rights could affect a defendant's Fifth Amendment right against self-incrimination. So, "explicit threats to eliminate or interfere with a suspect's custody of a young child unless the suspect provides satisfactory statements to the police are presumed to be coercive. The same is true of threatening the child's support from the state or conditioning future interactions on cooperation. [Citations omitted]." *Janusiak v. Cooper*, 937 F.3d 880, 891 (7th Cir. 2019) (explaining the lessons learned from Lynumn). But that is not the case here. Hagen's alleged threats did not force Barlow to decide between two rights, forfeiting one. And Hagen did not threaten to sever or negatively affect Barlow's parental rights. Thus, *Lynumn* and *Brown* are distinguishable.

When considering an officer's statements about a suspect's children generally—and not about the parent-child relationship particularly—a different rubric than *Lynumn* and *Brown* helps guide our decision. As a general rule, "police are not forbidden from talking about a suspect's children." *Janusiak*, 937 F.3d at 891. And a confession is not involuntary merely because an officer speaks about the potential good-faith arrest of a family member. *Allen v. McCotter*, 804 F.2d 1362, 1364 (5th Cir. 1986); *Newland v. Hall*, 527 F.3d 1162, 1189 (11th Cir. 2008).

Nonetheless, we carefully scrutinize how an officer speaks about a suspect's family members as part of the totality of the circumstances. See *United States v. Hill*, 340 F. Supp. 344, 350 (E.D. Pa. 1972) (stating in dicta "that to manipulate the defendant's decision by prolonged emphasis on its effect on the fate of his wife is a dangerous course

8

at best, in that there is a good possibility that some defendants, even innocent ones, might under the circumstances make false incriminating statements to procure the release of a loved one"); see also *Stanton v. Commonwealth*, 349 S.W.3d 914, 920-21 (Ky. 2011) (stating, when police deliberately prey on parental instincts and insinuate only the suspect's confession will save them, "officers run a grave risk of overreaching"). We address these facts below, in examining the totality of the circumstances.

*Swanigan*

Barlow's reliance on *Swanigan* is unfounded. In *Swanigan,* the court disapproved of the officer's apparent hypocrisy: "[W]e fail to see how law enforcement can be required by *Miranda* to advise Swanigan of his right to remain silent, and then can be allowed to warn him of punishment [of additional charges] for his 'noncooperation' when he exercises that right." 279 Kan. at 37.

Yet, Hagen did not engage in this hypocrisy. Hagen's inference about potential charges concerned H.B., not Barlow. While it is impermissible for police to penalize an individual for exercising his Fifth Amendment privilege, that privilege is personal and is only for the benefit of the person invoking that privilege. See *Miranda v. Arizona*, 384 U.S. at 468 n.37; *Rogers v. United States*, 340 U.S. 367, 371, 71 S. Ct. 438, 95 L. Ed. 344 (1951). So even if Hagen had threatened to penalize H.B. for Barlow's noncooperation, Barlow cannot reap the benefit from a privilege that is not at play—that is, H.B.'s privilege against self-incrimination. Moreover, "[w]ithout more, an officer's truthful description of the family member's predicament is permissible since it merely constitutes an attempt to both accurately depict the situation to the suspect and to elicit more information about the family member's culpability." *United States v. Hufstetler*, 782 F.3d 19, 24 (1st Cir. 2015); see *State v. Grimes*, 23 Neb. App. 304, 317-18, 870 N.W.2d 162 (2015) (listing cases in which courts have found threats coercive when police did not have probable cause for a family member's arrest).

9

*Unfairness Due to Exhortations to Speak the Truth*

Barlow next contends that Hagen's repeated requests for Barlow to tell the truth coerced him to confess. An officer's repeated exhortations to tell the truth combined with insistence that the defendant must come up with an explanation for incriminating facts can create "considerable pressure" for a defendant to come up with an explanation. See *Stone*, 291 Kan. at 24. On the other hand, the "'mere exhortation or adjuration to speak the truth, or the mere suggestion to an accused that he confess, will not exclude a confession.' [Citation omitted.]" *State v. Newfield*, 229 Kan. 347, 359, 623 P.2d 1349 (1981); see *United States v. Chalan*, 812 F.2d 1302, 1308 (10th Cir. 1987) (finding defendant's confession voluntary despite officer's exhortations to tell the truth).

*Totality of Circumstances*

We look at the totality of the circumstances surrounding Barlow's confession. First, Barlow acknowledged that he understood his *Miranda* rights and decided to waive them. This weighs heavily towards the voluntariness of a confession. See *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984).

Second, Hagen did not make substantial misrepresentations to Barlow. If Barlow's initial statements were true, then H.B.'s statements would not be true, so Hagen would have had probable cause to charge H.B. with making a false statement to police, violating K.S.A. 2018 Supp. 21-5904(a)(1)(A). See *Allen*, 804 F.2d at 1364. Although the picture Hagen painted of the potential legal consequences H.B. could face was unlikely, it was not false or misleading. See *Hufstetler*, 782 F.3d at 24. And his statements, though exaggerated, did not appear to affect Barlow's ultimate decision to confess. See *Frazier v. Cupp*, 394 U.S. 731, 739, 89 S. Ct. 1420, 22 L. Ed. 2d 684 (1969) (showing generally courts have found misrepresentations by police insufficient to make an otherwise

10

voluntary confession inadmissible). Hagen's statements concerning H.B.'s predicament if she gave a false statement did not overbear Barlow's will.

Third, nothing about the manner and duration of the interrogation suggests Barlow's confession was involuntary. During the conversation, Barlow did not appear to be fatigued, confused, or exceedingly anxious. Hagen did not physically threaten Barlow or put him in a physically or mentally demanding situation. The tone between Barlow and Hagen was conversational, calm and casual, and never adversarial. Even Hagen's statements about H.B.'s predicament were not presented in a threatening manner. The manner and context in which Hagen made these statements did not overbear Barlow's will by emotional manipulation. See *Hill*, 340 F. Supp. at 350.

Fourth, two-and-a-half-hours passed between Barlow's first interview and the second. See *Swanigan*, 279 Kan. at 42. After the first interview, Barlow was taken back to his home and was released. During that time Barlow decided to confess, based on his own reasons.

Fifth, Barlow's statements about his spiritual need to confess point toward the voluntariness of his confession. The impetus for his second interview and for his confession was personal or spiritual, rather than because of anything Hagen said or did. Barlow initiated the second interview and his confession.

Sixth, the record shows Barlow was of sound mental condition and was fluent in English. Nothing about his age, apparent intellect, or background points toward the involuntariness of his confession. See *Stone*, 291 Kan. at 21.

Under the totality of the circumstances, we find that the State met its burden to prove, by a preponderance of the evidence, that Barlow's confession was voluntary. The district court correctly denied his motion to suppress.

11

*Is K.S.A. 2018 Supp. 60-455(d) Unconstitutional Under the United States and Kansas Constitutions?*

Barlow next argues that K.S.A. 2018 Supp. 60-455(d) violates due process under the Kansas and United States Constitutions. That statute generally states that in a criminal action in which the defendant is accused of certain sex offenses, evidence that the defendant committed another act of sexual misconduct is *admissible*, and it may be considered for its bearing on any matter to which it is relevant and probative. That propensity rule contrasts with the general rule in K.S.A. 2018 Supp. 60-455(a) that evidence a person committed a prior crime or civil wrong is *inadmissible* to prove that person's disposition to commit a crime or civil wrong. Barlow contends the use of sexual propensity evidence erodes the presumption of innocence and allows the State to shirk its burden of proving every crime beyond a reasonable doubt.

*Standard of Review*

A statute's constitutionality is a question of law subject to unlimited review. *State v. Petersen-Beard*, 304 Kan. 192, 194, 377 P.3d 1127 (2016). This court presumes statutes are constitutional and "must resolve all doubts in favor of a statute's validity." *State v. Soto*, 299 Kan. 102, 121, 322 P.3d 334 (2014). The party attacking the statute bears the burden to prove the statute is unconstitutional. *State ex rel. Schneider v. Liggett*, 223 Kan. 610, 616, 576 P.2d 221 (1978). "Before a statute may be stricken . . . it must clearly appear the statute violates the Constitution." *Bair v. Peck*, 248 Kan. 824, Syl. ¶ 1, 811 P.2d 1176 (1991).

*Federal Constitution*

Barlow's arguments about the federal Constitution are identical to those the Kansas Supreme Court rejected in *State v. Boysaw*, 309 Kan. 526, 439 P.3d 909 (2019).

*Boysaw* upheld the constitutionality of K.S.A. 2018 Supp. 60-455(d) under both the Kansas and United States Constitutions. The *Boysaw* court held that K.S.A. 2018 Supp. 60-455(d) does not violate federal constitutional protections:

> "The history of the use of propensity evidence in Kansas, coupled with the procedural safeguard of weighing the probative against the prejudicial effect of the evidence, leads us to conclude that K.S.A. 2018 Supp. 60-455(d) does not offend any principle of justice so rooted in the traditions and conscience of the people of this state that it may be deemed fundamental. K.S.A. 2018 Supp. 60-455(d) does not violate federal constitutional protections." 309 Kan. at 536.

"This court is duty bound to follow Kansas Supreme Court precedent absent some indication that the court is departing from its previous position." *State v. Meyer*, 51 Kan. App. 2d 1066, 1072, 360 P.3d 467 (2015). Because we find no indication of such a departure, Barlow's argument that K.S.A. 2018 Supp. 60-455(d) violates due process under the United States Constitution fails.

*Kansas Constitution*

Next, Barlow contends that because the Kansas Constitution may provide greater rights than the United States Constitution, K.S.A. 2018 Supp. 60-455(d) is unconstitutional under the Kansas Bill of Rights.

Although *Boysaw* did not decide that substantive issue, it established a procedural requirement for future challenges under the Kansas Constitution to the admission of propensity evidence:

> "Boysaw points to nothing in the history of the Kansas Constitution or in our caselaw that would suggest a different analytic framework for questions of fundamental fairness, due process, or double jeopardy. . . . In short, Boysaw does not articulate

13

grounds explaining why a different result should follow if state, rather than federal, guidelines are to govern the constitutionality of propensity evidence.

. . . .

"We also note that section 18 of the Kansas Constitution Bill of Rights did not create new rights but merely recognized systems of laws established prior to the adoption of the Constitution.

"Historically, our courts have analyzed sections 10 and 18 as coextensive with their federal counterparts.

"Any future challenge to the admission of propensity evidence under K.S.A. 2018 Supp. 60-455(d) that is based on state constitutional provisions will need to explain why this court should depart from its long history of coextensive analysis of rights under the two constitutions. [Citations omitted.]" 309 Kan. at 536-38.

Barlow fails to explain how the Kansas Constitution provides more expansive protection for propensity evidence than does the United States Constitution. Instead, he points to two appellate decisions from Missouri and Iowa: *State v. Ellison*, 239 S.W.3d 603, 607-08 (Mo. 2007), and *State v. Cox*, 781 N.W.2d 757 (Iowa 2010). But these are the same cases the *Boysaw* court considered and rejected. 309 Kan. at 535-37. Barlow also fails to explain "why this court should depart from its long history of coextensive analysis of rights under the two constitutions." 309 Kan. at 538. Barlow's procedural failings prevents us from reaching the merits of his contention that K.S.A. 2018 Supp. 60-455(d) is unconstitutional under the Kansas Bill of Rights.

*Did the District Court Err by Admitting Evidence of Barlow's Prior Sexual Misconduct?*

Barlow next argues that the district court erred by admitting evidence of his prior sexual misconduct—his sexual contact with H.B. in Wichita. Barlow argues that this evidence was not relevant to the offenses charged in Geary County, and that its prejudicial effect outweighed it probative value.

14

*Standard of Review*

Appellate courts review a district court's decision to admit evidence using a two-step process. First, we determine whether the evidence is relevant. Generally, all evidence is admissible if relevant. K.S.A. 60-407(f). Evidence is relevant if it has "any tendency in reason to prove any material fact." K.S.A. 60-401(b). This definition encompasses two elements: whether the evidence is material and whether the evidence is probative. Evidence is material when the fact it supports is in dispute and is significant under the substantive law of the case. Evidence is probative if it furnishes, establishes, or contributes toward proof. *State v. McCormick*, 305 Kan. 43, 47, 378 P.3d 543 (2016). We review the materiality of evidence de novo, while we review the district court's decision regarding the probative value of evidence for abuse of discretion. *State v. Boleyn*, 297 Kan. 610, 622, 303 P.3d 680 (2013).

Second, we consider the prejudicial effect of admitting the evidence. Even if evidence is relevant, a district court may exclude it pursuant to K.S.A. 60-445:

> "Except as in this article otherwise provided, the judge may in his or her discretion exclude evidence if he or she finds that its probative value is substantially outweighed by the risk that its admission will unfairly and harmfully surprise a party who has not had reasonable opportunity to anticipate that such evidence would be offered."

Despite the statute's narrow language, the Kansas Supreme Court has broadly construed it to mean that a district court may exclude relevant evidence if the court determines the probative value of the evidence is outweighed by its potential for producing undue prejudice. *State v. Lowrance*, 298 Kan. 274, 291, 312 P.3d 328 (2013). It thus reads the statute as though it were identical to the Federal Rule of Evidence 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice.").

15

We review probativity for an abuse of discretion. *Lowrance*, 298 Kan. at 291. A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the district court; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Marshall*, 303 Kan. 438, 445, 362 P.3d 587 (2015). As the party challenging the district court's decision, Barlow bears the burden of establishing the district court's abuse of discretion. See *State v. Woodring*, 309 Kan. 379, 380, 435 P.3d 54 (2019).

*Relevance*

Under K.S.A. 2018 Supp. 60-455(d), "evidence of the defendant's commission of another act or offense of sexual misconduct is admissible and may be considered for its bearing on any matter to which it is relevant and probative." Evidence is relevant if it has a "'tendency in reason to prove any material fact.' K.S.A. 2018 Supp. 60-401(b)." *State v. Bowen*, 299 Kan. 339, 348, 323 P.3d 853 (2014). "Relevance is established by a material or logical connection between the asserted facts and the inference or result they are intended to establish." *State v. Phillips*, 295 Kan. 929, Syl. ¶ 7, 287 P.3d 245 (2012). Our Supreme Court has ruled many times that in sex offense cases propensity evidence is relevant—i.e., it has a legitimate and effective bearing on the defendant's guilt. See *Bowen*, 299 Kan. at 349.

The State admitted evidence of Barlow's sexual touching of H.B. when they lived in Wichita. This evidence shows that Barlow began touching H.B. and that it continued under similar circumstances when the family moved to Geary County. It shows that Barlow had a propensity to engage in sexual touching of H.B, which makes it more probable that Barlow committed the charged crimes. Thus, the evidence was relevant.

16

*Probative Value v. Prejudicial Effect*

The second step for the district court, when admitting evidence under K.S.A 2018 Supp. 60-455(d), is to determine whether the evidence is probative. Evidence is probative if it "furnishes, establishes, or contributes toward proof." *State v. Coones*, 301 Kan. 64, 78, 339 P.3d 375 (2014).

Although the statute does not require a weighing of the probative value against the potential prejudice, the Kansas Supreme Court continues to require that weighing. *Boysaw*, 309 Kan. at 540. It has offered several factors for balancing the probative value of propensity evidence in sex abuse cases against its potential for prejudice:

> "'1) how clearly the prior act has been proved; 2) how probative the evidence is of the material fact it is admitted to prove; 3) how seriously disputed the material fact is; and 4) whether the government can avail itself of any less prejudicial evidence. When analyzing the probative dangers, a court considers: 1) how likely it is such evidence will contribute to an improperly-based jury verdict; 2) the extent to which such evidence will distract the jury from the central issues of the trial; and 3) how time consuming it will be to prove the prior conduct. [Citations omitted].'" *Bowen*, 299 Kan. at 350.

Barlow challenges the first factor. He contends that the State did not clearly or sufficiently prove his prior sexual misconduct with H.B. because that evidence came solely from H.B.'s testimony, instead of from a previous conviction. Because H.B.'s allegations of prior bad acts in Wichita were neither proved beyond a reasonable doubt nor admitted by Barlow, he contends the evidence has little probative value.

But K.S.A. 2018 Supp. 60-455(d) does not require that prior bad acts be proved beyond a reasonable doubt. K.S.A. 2018 Supp. 60-455(d) does not differentiate evidence of prior sexual misconduct based (1) on the form from which that evidence arises or (2) if a prior fact-finder has found the evidence reached a certain burden of proof. Instead, the

17

statute states that "evidence of the defendant's commission of another act or offense of sexual misconduct is admissible." It does not suggest that this evidence is limited to a prior conviction. So relevance and probative value are the only express limiting factors on admission of this evidence. The plain language of the statute does not distinguish between a prior conviction and an allegation, as Barlow argues.

Evidence of Barlow's previous sexual contact was supported not only by H.B.'s sworn testimony but also by Barlow's corroborating statements. Although H.B. was not specific in exactly how and when the sexual contact began, she testified that it began in Wichita. And Barlow's statements to Hagen confirmed his sexual acts with H.B. in Wichita. Both independently provided some detail about Barlow's prior sexual misconduct. Our Supreme Court has allowed admission of evidence of prior uncharged sexual misconduct based solely on the victim's testimony. See, e.g., *State v. Prine*, 297 Kan. 460, 481, 303 P.3d 662 (2013); *State v. Spear*, 297 Kan. 780, 788-89, 304 P.3d 1246 (2013). We find the State clearly introduced the evidence for the purposes of its probative value.

Next, Barlow argues that the evidence was unduly prejudicial because it likely caused the jury "to conclude that because Mr. Barlow committed sexual misconduct in the past, he likely committed the crimes charged in the present case." But this is exactly what propensity evidence does. Accepting Barlow's argument would render K.S.A. 2018 Supp. 60-455(d) ineffective.

We find no abuse of discretion in the district court's conclusion that the evidence of Barlow's prior sexual touching of H.B. was more probative than prejudicial.

*Did the District Court Abuse Its discretion by Denying Barlow's Motion to Admit Evidence Under the Rape Shield Law?*

Barlow next asserts that the district court abused its discretion by denying his motion to admit evidence of H.B.'s text messages with her boyfriend: one text stated her first rapist "wore a mask"; other texts revealed her sexual relationship with her boyfriend. The district court found this evidence irrelevant and excluded it under K.S.A. 2018 Supp. 21-5502. Barlow contends that no reasonable person could have made that conclusion.

*Analysis*

Barlow argues that the text messages were relevant to whether Barlow engaged in sexual touching with H.B. He also argues that the district court's exclusion of H.B.'s text messages with her boyfriend denied him his right to present his theory of defense.

A defendant is entitled to present his theory of defense. Excluding relevant, admissible, and noncumulative evidence which is an integral part of the theory of defense violates the defendant's fundamental right to a fair trial. The defendant's right to present a defense, however, is limited by the statutory rules of evidence. *State v. Holman*, 295 Kan. 116, Syl. ¶ 5, 284 P.3d 251 (2012), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016).

K.S.A. 2018 Supp. 21-5502 is one such rule. It restricts the admission of evidence of a sexual assault victim's prior sexual activity. *State v. Atkinson*, 276 Kan. 920, 926, 80 P.3d 1143 (2003). This rape shield statute "'serves to focus both judges' and attorneys' attention upon the fact that the victim's prior sexual activity is not generally relevant, reminding them that a victim's lack of chastity has no bearing whatsoever on her truthfulness and generally has no bearing on the important issue of consent.' [Citation omitted.]" 276 Kan. at 926. The district court concluded that the evidence Barlow sought

19

to admit was exactly the type of evidence that Kansas' rape shield law was meant to exclude.

Evidence of a victim's prior sexual conduct is admissible if proved relevant to any fact at issue, "such as the identity of the rapist, the consent of the victim, and whether or not the defendant actually had intercourse with the victim." 276 Kan. at 926.

> "Relevancy . . . is the key consideration when applying the rape shield statute. . . . In the past, this court has concluded that prior sexual conduct evidence may be material if it is relevant to issues such as the identity of the rapist, consent of the complaining witness, or whether the defendant actually had intercourse with the complaining witness. The court has cautioned, however, that 'the legislature sent a clear message to the courts that a rape victim's prior sexual activity is generally inadmissible since prior sexual activity, even with the accused, does not of itself imply consent to the act complained of.' [Citations omitted.]" *State v. Berriozabal*, 291 Kan. 568, 586, 243 P.3d 352 (2010).

Barlow contends the excluded texts were relevant to show that he had not had intercourse with H.B. Barlow argues that her text that her "first rapist" wore a mask is relevant because it tends to show that someone else abused H.B., or that she made other false accusations in the past. But if someone had abused H.B. in the past, that would not make it less likely that her testimony about Barlow's sexual misconduct is false. See *Atkinson*, 276 Kan. at 926. And nothing shows the falsity of H.B.'s past accusation. Further, the nature of a vague text message to her boyfriend about a masked rapist is qualitatively different from a report to her mother and the police accusing her father of molestation. Thus, this text message would have little bearing on H.B.'s credibility about Barlow molesting her.

Barlow also argues that the text messages would have shown that H.B. had seen her boyfriend's testicles during sexual encounters with him, so she would have had "a

20

point of reference for comparison" to Barlow's enlarged testicle and would have mentioned it to someone. That H.B. did not spontaneously mention his enlarged testicle, Barlow reasons, discredits her testimony that he molested her. But that is mere speculation.

As the district court found, admission of the text messages would have accomplished precisely what the rape shield law was meant to prevent: showing the jury that H.B. was unchaste because she was engaged in a sexual relationship with her boyfriend. This is apparent from Barlow's counsel's statement when he proffered this evidence:

> "Specifically, we would have elicited testimony about the extent and nature of their sexual relationship with her boyfriend that we heard about during the examination . . . . And we would have done that for the express purpose of showing that she had sexual experience sufficient to fabricate these types of claims, and also to show the extent of the relationship and the motive to fabricate allegations against her father given the fact that he had the ability to cut off the wifi time and limit her communication with her boyfriend."

This evidence was minimally relevant to show whether Barlow sexually molested H.B., but it is inconsistent with our rape shield law. We find that a reasonable person could agree with the district court's decision to exclude the texts as protected by the rape shield law.

*Did the District Court Err by Instructing the Jury?*

Barlow's last claim of error relates to a jury instruction. He contends the instruction, "if you have no reasonable doubt, you should find the defendant guilty," was legally inappropriate. Barlow argues that "should" is the same as "must" and improperly conveys a moral obligation to convict. See *State v. Lovelace*, 227 Kan. 348, 354, 607

21

P.2d 49 (2014), *overruled by State v. Smith-Parker*, 301 Kan. 132, 164, 340 P.3d 485 (2014). Thus, Barlow contends, the instruction usurps the jury's inherent power of nullification. Barlow objected to this instruction, asking to substitute the word "may" for "should," but the district court denied his request.

The Kansas Supreme Court recently summarized the stair-step analysis for jury instruction challenges:

> "Generally, an appellate court reviewing a jury instruction challenge must determine whether the issue was preserved; whether the instruction was legally and factually appropriate; and whether any error was harmless." *State v. Barrett*, 309 Kan. 1029, 1036-37, 442 P.3d 492 (2019).

Barlow preserved this issue by his objection at trial. Barlow tacitly concedes the jury instruction was factually appropriate. His only claim of error is that the jury instruction is not legally appropriate. To determine whether a jury instruction is legally appropriate, we exercise de novo review. *State v. Plummer*, 295 Kan. 156, 161, 283 P.3d 202 (2012).

The Kansas Supreme Court has held that this jury instruction is proper. See *State v. Carter*, 305 Kan. 139, 160, 380 P.3d 189 (2016) (stating a jury instruction of similar language was "a proper reasonable doubt instruction"). It has repeatedly found that while "must" may be legally improper in such a jury instruction, "should" is less of an imperative than "must" or "will." See *Smith-Parker*, 301 Kan. at 164; *State v. Pennington*, 254 Kan. 757, 764, 869 P.2d 624 (1994). Should is a normative suggestion. It is not a command. Our court has similarly rejected this claim, finding no mandatory duty:

"Unlike the words 'must,' 'shall,' and 'will,' the word 'should' does not express a mandatory, unyielding duty or obligation; instead, it merely denotes the proper course of action and encourages following the advised path. Accordingly, the reasonable doubt instruction contained at PIK Crim. 4th 51.010, which states that if the jury has no reasonable doubt as to the truth of each [of] the claims asserted by the State it 'should find the defendant guilty,' does not usurp the jury's inherent power of nullification." *State v. Allen*, 52 Kan. App. 2d 729, Syl. ¶ 5, 372 P.3d 432 (2016).

The instruction Barlow challenges was taken word for word from PIK Crim. 4th 51.010 (2017 Supp.), and is legally appropriate. See *State v. Butler*, 307 Kan. 831, 847, 416 P.3d 116 (2018) (strongly recommending the use of PIK instructions, "which knowledgeable committees develop to bring accuracy, clarity, and uniformity to instructions"). The district court did not err by giving this instruction.

Affirmed.